# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### June 3, 2014 Session

## STATE OF TENNESSEE v. JOSEPH CARONNA

### Appeal from the Criminal Court for Shelby County
### No. 09-07393    W. Mark Ward, Judge

### No. W2013-00845-CCA-R3-CD  -  Filed November 18, 2014

The Defendant-Appellant, Joseph Caronna, was convicted by a Shelby County jury of first degree murder of his wife and sentenced to life imprisonment in the Department of Correction.  On appeal, he argues that his right to a speedy trial was violated and that the evidence was insufficient to support his conviction.  He also argues that the trial court erred in admitting certain evidence, including prior acts of financial fraud; bad acts relating to the victim's mother; an extramarital affair; and the victim's statements concerning the closing on a new house.  After a thorough review, we discern no reversible error and affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ALAN E. GLENN, J., joined. JEFFREY S. BIVINS, J., Not Participating.

Stephen C. Bush, District Public Defender; Barry W. Kuhn (on appeal); Lawrence R. White, Mary Katherine Kent, and Alicia Kutch (at trial), Assistant Public Defenders, Memphis, Tennessee, for the Defendant-Appellant, Joseph Caronna.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Karen Cook, Thomas Henderson, and Danielle McCollum, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

This case concerns the death of the Defendant's wife, Tina Caronna, who disappeared on October 25, 2008.  Two days later, on October 27, 2008, her body was discovered in the back of her Chevy Avalanche in Bartlett, Tennessee.  The victim's cause of death was

asphyxia or strangulation. Part of the police investigation revealed that when an inmate asked the Defendant how to kill someone and avoid detection "with all the 'CSI'" technology, the Defendant replied, "Suffocate them." The Defendant also told the inmate several details about the victim's death that were unknown to the public. A few months after the victim's death, a Shelby County grand jury returned a single-count indictment charging the Defendant with first degree premeditated murder of the victim. At trial, the State built its case against the Defendant based largely on circumstantial evidence, which included over 40 witnesses. The bulk of the witness testimony described the events leading up to the victim's disappearance, her marital relationship, the Defendant's extramarital affair, and the Defendant's financial misdeeds. In order to address the issues presented in this appeal, a full recitation of the proof adduced at trial, which began on October 22, 2012, is necessary.

**State's Proof.** Clara Murphy, the victim's mother, testified that her daughter and the Defendant had been married for fifteen years. The victim met the Defendant when he was a manager at a shoe store. After the couple's marriage, the victim's father trained the Defendant in insurance sales. Ms. Murphy said that she was very close with her daughter but that their relationship changed after the victim was married. When Ms. Murphy's husband passed away in June 2007, she and the victim stopped communicating because the victim took the Defendant's side in a family disagreement. In September 2008, a month before the victim died, Ms. Murphy and her daughter began to exchange e-mails.

At around 11:00 a.m. on Saturday, October 25, 2008, Ms. Murphy learned from the victim's son that he was unable to reach the victim or the Defendant. Later that night, Ms. Murphy discovered that people were searching for her daughter. Ms. Murphy said that the Defendant did not call her until the victim's truck had already been found.

Pat Hathaway testified that she and her husband, Gary, had known the victim and the Defendant for ten years. They met through the Corvette Club of Memphis and frequently traveled together. According to Ms. Hathaway, the victim and the Defendant appeared to have a loving relationship. She said that she rarely saw the Caronnas argue and that the couple was always together. Ms. Hathaway stated that the victim wished that she could have some time alone to go shopping and to nail appointments without the Defendant. She said that the victim was aware of the Defendant's affair with Becky Black but that the victim thought the relationship had ended.

Ms. Hathaway stated that the victim was very upset that her mother and the Defendant "had a falling out." She said that the Defendant frequently referred to the victim's mother as "the devil or a b***ch[.]" The weekend before the victim's death, the Hathaways and the Caronnas had taken a trip together to a car show in Knoxville. According to Ms. Hathaway,

the victim "seemed very distracted" and "[s]he was not herself." The victim, who usually enjoyed shopping, did not want to shop, explaining that she had "a lot on [her] mind."

Ms. Hathaway called the victim at 9:00 a.m. on Saturday, October 25, 2008. When she told the victim about running into the victim's mother at dinner the night before, the victim began to cry and asked if her mother had inquired about her. Ms. Hathaway thought she heard the Defendant become angry in the background, but the sound was muffled as though the victim had covered the phone with her hand. When the victim returned to the phone, she was no longer crying, and she talked about how the Defendant had planned to surprise her the night before with the closing on their new house. The victim told Ms. Hathaway that she did not need help before the Corvette Club dinner that evening and that the Defendant would help her prepare for the party.

When Ms. Hathaway returned home at around 2:00 p.m. that day, she saw the Defendant in her driveway playing with her granddaughter. She thought it was odd because the Defendant usually did not pay attention to her grandchildren. The Defendant and Mr. Hathaway had been working on cars in the Hathaways' large garage. She said that the Defendant would usually leave his car at the Hathaway house and that "he wouldn't hang around" unless the victim was also there. When Ms. Hathaway asked where the victim was, the Defendant said that she was getting items for the party. Ms. Hathaway then asked the Defendant why he was not helping the victim, and he responded that the victim "'wanted to go on her own.'" After returning inside her house, Ms. Hathaway called the victim but was unable to reach her. She recalled that the Defendant left around 4:00 p.m. and had repeatedly asked what time he should pick up the Hathaways to go to the Corvette Club. After leaving, the Defendant called the Hathaways wondering whether they had heard from the victim. The Hathaways then decided to attend the party on their own.

Ms. Hathaway said that she realized something was wrong when the victim did not show up for the party. She told another attendee who was a police detective about her concerns, and he issued a bulletin for the victim's Chevy Avalanche. The Hathaways then left the party to meet the Defendant at his home. They waited for the Defendant, who returned shortly, stating that he had been searching for the victim. Ms. Hathaway testified that the house was dark and that the Defendant shouted, "'Tina, are you home, are you home.'" According to Ms. Hathaway, the victim would have had the lights on and music playing if she were there. Inside the home, Ms. Hathaway detected a strong odor of bleach and could see bleach and other cleansers next to the kitchen sink.

The Hathaways and the Defendant then left the house and looked for the victim at various stores, hospitals, and other places where she may have been. Ms. Hathaway testified that despite her repeated suggestions, the Defendant was reluctant to file a police report that

night. Finally, at around midnight, they went to the police station on Whitten Road. She said that the Defendant told the police officer that the victim was missing and then remarked, "'[W]ell, if it were you, wouldn't you think that your wife just got mad and left[?]'" On Sunday morning, thirty or forty members of the Corvette Club convened at the Defendant's house and then distributed flyers at various businesses.

On cross-examination, Ms. Hathaway testified that the Caronnas had planned on driving to the party with the Hathaways in the Defendant's Chevrolet Chevelle. She said that it was not unusual for Corvette Club members to work on their cars with Mr. Hathaway. She stated that the Defendant appeared concerned and tired on Sunday. Ms. Hathaway was outside the Defendant's house on Monday morning when she received news that the victim's Chevy Avalanche had been found. Once inside, she said that the Defendant shoved a glass bowl full of marbles onto the floor after he learned that the police had found the victim's truck. Ms. Hathaway testified that the Defendant "was very mad and upset." She acknowledged that the victim was a very intelligent and successful vice president at a financial services firm.

Douglas Turner testified that he had been the previous Corvette Club president and that the victim was the newly elected president in October 2008. On Friday afternoon, October 24, Mr. Turner met with the victim to prepare for the club's progressive dinner party on Saturday night. He stated that the victim had volunteered to buy the food and drinks for the dinner. Mr. Turner and the victim loaded two tables and two ice chests into the victim's black pick-up truck. After that, he never saw the victim again. Mr. Turner helped search for the victim on Saturday night and on Sunday.

On cross-examination, Mr. Turner recalled that a roll of duct tape fell out of the truck while he was loading things into the Avalanche. He could not remember the color of the tape, but it was not gray. He said that the ice chests had not been cleaned since the previous event and still had drinks inside.

Patti Locke testified that she and her husband, Gray, had known the Caronnas for about ten years through the Corvette Club. She said that they were close friends with the Hathaways and the Caronnas and that the couples often traveled and dined together. On Friday, October 24, 2008, Ms. Locke called the victim to explain that she could not attend the dinner party on Saturday. During their thirty minute conversation, the victim discussed all the changes that she planned to make in the new house that she was purchasing.

While Ms. Locke was at her daughter's band competition on Saturday night, she received missed calls from Corvette Club members inquiring about the victim. The Lockes then dropped off their daughter and drove around searching for the victim. Ms. Locke stated

that it was around midnight when she met the Defendant and the Hathaways at the Defendant's home. In considering whether the victim may have voluntarily left, Ms. Locke discovered that the victim's suitcases, jewelry, money, and medications were still at the house.

On Sunday morning, Ms. Locke and other Corvette Club members met at the Caronnas' house to coordinate a plan to find the victim. She said that the goal was to "saturate the city" with a flyer of the victim and her truck. Ms. Locke went with the Defendant and the victim's son, Todd Gray, to the Appling Farms precinct to attach the victim's vehicle to the missing person report. She said that she wanted to call Billy Garrett of the Appling Farms precinct, but the Defendant responded that he and the victim had a pact that they would not make each other look bad in public. The Defendant did not want to call the police in the event that the victim had "run off with somebody[.]" Ms. Locke told the Defendant that she would "take the heat," and then she called Billy Garrett.

After learning that the Avalanche had been found on Monday morning, Ms. Locke went to the Defendant's house to comfort the victim's son. She said that after the police told the Defendant about the truck, the Defendant "swatted" a glass vase off a table and it shattered on the floor. She stated that the Defendant did not like the victim's family and that the victim felt very sad about her estrangement from her mother. To her knowledge, the Defendant never called the victim's mother about the victim's disappearance.

On cross-examination, Ms. Locke recalled telling the police that the victim had a "rocky relationship" with her mother and that their tension "wasn't anything new." She also told the police that she "wouldn't be surprised if Tina used bleach to clean the coolers out because they were nasty." Ms. Locke agreed that the victim generally used cash to pay for items and that she may have had a lot of cash on the day of her disappearance. She said that the victim liked to shop and owned three hundred pairs of shoes. She stated that the Defendant seemed sincerely worried about the victim. Ms. Locke testified that the victim had mentioned finding a different mortgage company with a lower rate for the new house, which contributed to the delay in the closing. She was not aware of a definite closing date.

Matthew Struna met the Caronnas in early 2000 through the Memphis Corvette Club. He explained that the club consisted of a group of car enthusiasts who frequently socialized together. He and his wife were the first hosts of the progressive dinner party on Saturday, October 25, 2008. He testified that he called the victim at around 10:14 a.m. on Saturday to ask if she needed help before the party. They spoke for a few minutes, and the victim told Mr. Struna that she could take care of the preparations. He said that the Caronnas owned three Corvettes at the time and that he had suggested that the victim take an antique Corvette to the party instead of the Chevelle. Mr. Struna stated that it was unusual for the victim to

fail to appear at the party because she "was never late for anything." He said that the Hathaways left shortly after they arrived to search for the victim.

Mr. Struna was familiar with the Caronnas' Corvettes and their other vehicles. He said that the Defendant took "immaculate" care of his collector cars and that the Chevy Avalanche was the Defendant's "every day vehicle." He stated that it was common for Corvette Club members to keep their valuable cars covered and in storage to protect them from the weather. According to Mr. Struna, the Defendant kept his cars in a storage unit several miles away in Bartlett. He said that the Defendant "rotated" which collector car was at his house based on whether there was a social function or if the car needed maintenance.

When Mr. Struna arrived at the Defendant's home on Sunday morning, he thought it was strange that there was a red Corvette in the driveway and the Chevelle was in the garage. He testified that "there was one too many cars," and he never knew the Defendant to have left a collector car outside overnight. He observed that it would be unusual for the Defendant to drive both vehicles at the same time. He knew that the Defendant had worked on the Chevelle at Mr. Hathaway's house the day before, but he saw no reason for the red Corvette to be outside the house rather than in storage.

Approximately four months after the victim's death, Mr. Struna and the Defendant visited her grave site. He had agreed to accompany the Defendant and the Defendant picked him up in a new Hummer. The experience was very emotional for both men. After the visit, Mr. Struna suggested that they test drive the new Dodge Challenger to lighten the mood. He said that the Defendant purchased one of the vehicles a few days later. Mr. Struna stated that the Defendant accompanied the Strunas to their church sometimes and brought a date on one occasion. He also testified that about three or four months after the victim's death, the Defendant asked Mrs. Struna a few times if she could "fix him up" with someone.

Mr. Struna said that he trusted the Defendant and invested money with him. At one point, he wrote a $15,000 check payable to Caronna Investments to purchase an Allianz annuity. Of the four different products that the Strunas bought, the Allianz policy was the only one that was delayed. Mr. Struna said that the Defendant always had a convincing reason for the delay such as a paperwork error or that Allianz was very slow. After the victim's death, Mr. Struna did not give much thought to the Allianz annuity until the postal inspector contacted him in June 2009. He then reviewed his documents and investigated the matter with Allianz. The company confirmed that it never received a $15,000 check from Caronna Investments on his behalf. Allianz then provided the Strunas with $15,000 plus interest.

Cindy Cox testified that she and her husband, Jeffrey, lived across the street from the Caronnas. She said that when she went to dinner and a movie with the victim on October 2, 2008, the victim had been sad because she missed her mother. On Sunday, October 26, 2008, she was returning home from lunch when the Defendant approached her and asked if she had seen or heard from the victim. She described the Defendant as very upset and distraught. He said that he did not know when his wife had left on Saturday because he was in the backyard doing yard work. Ms. Cox had a security camera above the garage so she suggested that they review the surveillance video to see what time the victim left. She stated that the camera recorded an aerial view of about two-thirds of the Caronnas' driveway but not the garage itself. She recalled that in the beginning of the video, the Defendant moved two cars out of the garage before moving the Avalanche into the garage. The Defendant told Ms. Cox that he needed the truck in the garage to load the tables for the dinner party. The Defendant also told her that he had to close the garage door. Ms. Cox stated that the time stamp on the video indicated that the Avalanche backed out of the driveway and left at two seconds past 11:00 a.m. She said that the camera time had not been changed for daylight savings and that the correct time would have been noon.

Ms. Cox explained that her street was shaped like a "U" with two ways to access the main road. She testified that once the truck backed out of the driveway, it went "the long way around." After viewing the video, she could not tell who was driving the vehicle. Ms. Cox stated that whenever she observed the victim leave the driveway, the victim would usually drive toward the stop sign to access the main road. She could not recall the victim ever taking the long way. She said that the Defendant told her that the victim's murder was either a robbery or gang-related.

Jeffrey Cox testified that his wife, Cindy, and the Defendant approached him in the early afternoon on Sunday, October 26, 2008 to review the video from his surveillance camera. He said that the driveway camera had a small hard drive and recorded over itself every two weeks. Mr. Cox stated that the Defendant was aware of the cameras because they had discussed installing similar ones in the Defendant's home. His testimony was consistent, in large part, with the testimony of his wife. Mr. Cox said that the Defendant moved a Porsche and a red car to the street in order to park the Avalanche in the garage. He could not recall if the Porsche was blue or black or whether the red car was the Chevelle or the Corvette. He could not tell if the garage door was open or closed because the camera did not record the garage itself. He stated that ten to thirty minutes passed before the Avalanche left the driveway that Saturday.

Mr. Cox was devastated when he learned on Monday that the victim's truck was found on Brannick Drive. He was familiar with the area, and he searched the surroundings for evidence before Bartlett police officers stopped him. At the time, he did not notify the police

about his surveillance video because he did not realize it was relevant. Mr. Cox and his wife were eventually interviewed by the Bartlett police in March 2009. At that point, the surveillance video from October 2008 "had been recorded over quite a few times" and the police were unsuccessful in recovering images from the hard drive.

On March 6, 2009, Mr. Cox reviewed his security cameras and observed people confiscating vehicles and other things from inside the Defendant's house. After he left a message on the Defendant's phone, the Defendant called back and said his cell phone was "'messed up'" and so the Defendant had to call from a payphone. The Defendant told Mr. Cox that he had car trouble and was attempting to return to Memphis after a family visit in Illinois. Regarding the removal of property from his home, the Defendant explained that the victim "'was into something in the Caymans or something about some insurance fraud[.]'"

On cross-examination, Mr. Cox acknowledged that he reported in his March 2009 police statement that the Defendant left in the red Chevelle after the truck had left the house. However, he could not recall this conversation or the events because it had been four years. He denied that the police suggested that the time stamp on the camera was off by one hour due to daylight savings time. Mr. Cox stated that his camera "was off every year" and that he had brought up the issue to the police.

Amanda Panis testified that in October 2008, she lived at the end of Brannick Drive in Bartlett. She explained that Brannick Drive was a dead-end street off of Elmore Road. On Saturday, October 25, Ms. Panis noticed a black Avalanche parked on her street while she was leaving for work at around 12:40 p.m. She stated that her initial reaction was that the truck would be towed because no parking signs had recently been posted on the street. Ms. Panis then realized that it was a Saturday and that the rules did not apply. On cross-examination, Ms. Panis acknowledged that in her initial police statement, she mistakenly reported observing the Avalanche at 9:45 a.m. on Saturday.

Retired Officer Teresa Birgnole of the Bartlett Police Department testified that on Monday, October 27, 2008, she responded to a call regarding a suspicious vehicle on Brannick Drive. At the scene, she verified that the vehicle was registered to the victim. In the backseat of the Avalanche, Ms. Birgnole observed a body covered by a blanket. She then contacted her supervisor and sealed off the crime scene.

Sergeant Connie Justice of the Memphis Police Department (MPD) Homicide Bureau testified that on Monday, October 27, 2008, she called the Defendant to follow up on the victim's missing person report. The MPD then learned that the victim's vehicle had been found in Bartlett, and Sergeant Justice interviewed the Defendant at his home. She did not notify the Defendant about the vehicle at this point. She said that the Defendant "was

obviously very distraught" and would sporadically tear up. She noticed "ten to fifteen faint bruises" on both of the Defendant's forearms. The bruises were round, one-half to one inch in diameter, and "blueish, purplish in color[.]"

During the interview, the Defendant told the investigators that he last saw the victim on Saturday. The Defendant said that he did not know what time the victim left because he did not wear a watch and he had been working on a Corvette and cleaning the backyard pool. The Defendant estimated that the victim left between 10:30 and 11:30 a.m. Sergeant Justice said that the Defendant did not mention the Hathaways or his neighbors' surveillance video. The Defendant expressed confusion in the reporting procedure because he believed that it was enough to notify Norm Jones, a fellow Corvette Club member and a police officer, about the victim's disappearance. The Defendant later told Sergeant Justice that he did file an actual missing person report at the Appling Farms precinct. He explained that he delayed in reporting his wife's disappearance because other people had suggested that there should be a "cooling off period." The Defendant denied that there had been an argument or disturbance before the victim's disappearance. He further stated that he thought the victim would be embarrassed if he had prematurely called the police. Sergeant Justice said that during the interview, the Defendant would intermittently cry, go get a drink, and speak on his cell phone.

Sergeant Justice stated that after about twenty-five minutes, the Defendant learned that his wife's vehicle had been found with a body inside. The Defendant then "immediately became angry[.]" As Sergeant Justice was leaving the house, she heard the sound of shattering glass but left without determining the source. After arriving at the scene on Brannick Drive, Sergeant Justice shared her observations with the Bartlett Police Department, who proceeded to investigate the victim's homicide.

Gary Hathaway testified that he and his wife, Patricia, were close friends with the Caronnas through the Corvette Club. Mr. Hathaway had known the Defendant and the victim for nearly a decade and was familiar with their vehicles. He advised the Defendant on a few of his auto purchases and they worked on the Defendant's cars together. Through visiting the Defendant's home about two times a week over the past few years, Mr. Hathaway developed familiarity with which of the Defendant's vehicles were typically kept at the house and which were stored in a rental locker several miles away. He said that both he and the Defendant used the same storage facility to keep their classic cars clean, safe, and out of the elements.

Mr. Hathaway stated that around the time of the victim's death in October 2008, the Defendant kept a red '80 Corvette, a motorcycle, and the victim's dark blue Porsche Carrera in the garage at the house. Outside of the garage, the Defendant also had a powder blue '83

Porsche that required maintenance and the black Avalanche truck which was his "daily driver." At the storage unit six or seven miles away from his house, the Defendant kept a yellow '69 Corvette convertible, a black Z06 Corvette, a black '85 Porsche, and a red '71 Chevelle. Mr. Hathaway said that the Defendant would alternate between which of his collector cars were kept in his garage or at the storage unit depending on whether the vehicle was being used or serviced.

Mr. Hathaway said that on the day of the victim's disappearance, the Defendant called him at around 11:30 a.m. to ask about working on the red Chevelle at his garage. He said that they had previously serviced the Chevelle a few weeks earlier but that the Saturday meeting was spontaneous and not specifically planned. He thought that the Defendant "seemed to be excited and in a hurry" on the phone. The Defendant told Mr. Hathaway that the victim was out shopping and that he had just finished draining the hot tub. The Defendant stated that it would take him a while to get to the Hathaways' home because he had to "go get the car." Before hanging up the phone, Mr. Hathaway said that he heard three pants. The Defendant then arrived at Mr. Hathaway's house at around 1:00 p.m., and they worked on the Chevelle for about an hour and a half. At one point, the Defendant "drifted out" and played with Mr. Hathaway's granddaughter while Mr. Hathaway and his son worked on the Chevelle. Mr. Hathaway thought that this behavior was "very surprising" because the Defendant was not fond of children. He said that it seemed as though the Defendant "was just kind of hanging around."

Mr. Hathaway testified that the Defendant had mentioned that he tried to call the victim's cell phone on two occasions that Saturday afternoon. The Defendant left the Hathaways' home at 4:00 p.m. to get ready for the dinner party. Mr. Hathaway said that the Defendant then called him at 4:45 p.m. inquiring about the victim. The Hathaways had planned on attending the party with the Caronnas in the Defendant's Chevelle, but they decided to go on their own. While at the party, Mr. Hathaway received another call from the Defendant at 5:15 p.m. asking whether the victim was there. Mr. Hathaway testified that he became very concerned because no one had seen or heard from the victim. He said that the victim was responsible for setting up the event and that she was "never late for anything." All the Corvette Club members then began to search for the victim and the Hathaways drove to the Defendant's home to meet him. The couple arrived at the Defendant's house at 6:00 p.m. and waited fifteen to twenty minutes for the Defendant to arrive. Mr. Hathaway said that when he saw the Defendant drive the red Corvette to the house, he assumed that the Defendant had "swapped out" the Chevelle for the Corvette from the storage unit. After entering the house, the Defendant told him to "'go check the shed.'" Mr. Hathaway did not understand the reasoning, but he did what the Defendant told him and looked in the shed in the backyard.

For the next six hours, the Hathaways drove with the Defendant to various locations in search of the victim. They went to the police station at 11:30 p.m. Mr. Hathaway testified that the Defendant's demeanor at the police station was atypical and that the Defendant appeared "kind of meek" rather than the usual "big burly kind of a guy[.]" According to Mr. Hathaway, the Defendant asked the police whether it was true that a missing person usually returns after a few days. The Defendant then inquired about the bulletin that a police officer friend had previously issued for the victim. Mr. Hathaway said that they left the police station without filling out any papers or filing a report.

Mr. Hathaway stated that the entire Corvette Club assembled at the Defendant's house on Sunday morning to help with the search. As the members were coordinating a plan, Mr. Hathaway recalled that someone had offered to look in Bartlett. He then heard the Defendant state, "'[D]on't go to Bartlett, Tina never goes to Bartlett.'" Mr. Hathaway then drove with the Defendant and their friend Gray Locke in his car to look for the victim. He recalled commenting that if something had happened to the victim, the Defendant would be the first suspect because he was the husband. Mr. Hathaway said that the Defendant responded, "'[W]ell, you're my alibi.'" He stated that throughout the day, the Defendant was resistant to involving the media in the victim's search. The Defendant explained that he was concerned because the police officer told him that most missing persons returned shortly, and he did not want to embarrass his wife with the media attention.

On Monday morning, Mr. Hathaway learned that the victim's body had been found in her vehicle on Brannick Drive. Although he was not familiar with the street at first, he immediately recognized the area once someone mentioned Summer Avenue and Elmore Road. Mr. Hathaway said that the storage locker where he and the Defendant kept their cars was located at the intersection of Summer and Elmore Road in Bartlett. He stated that the victim's body was found on Brannick Drive "about two blocks away[.]" Mr. Hathaway recalled that the Defendant had to retrieve his Chevelle from the storage unit on Saturday.

Mr. Hathaway noticed that the red '80 Corvette was parked in the Defendant's driveway on Monday. He did not understand why the Defendant would have kept the Corvette outside because the Defendant "would never leave a Corvette out over night when he didn't have to." He then saw the Chevelle parked inside the garage. Mr. Hathaway recalled that when he and his wife met with the Defendant on Saturday evening, the Defendant was driving the red Corvette. He had previously assumed that the Defendant had "swapped out" the Chevelle for the Corvette at the storage unit. He wondered how the Defendant could have gotten to the storage unit because a person would need a ride to and from the facility or he could drive there and "swap" the vehicle for another one. When Mr. Hathaway saw the Chevelle, he realized that the only vehicle near the storage unit was the Avalanche, which had been found "a stone's throw away" from the facility. He identified

a map depicting the Caronnas' residence on Eatonwick Drive, the Hathaways' residence on Bruton Parish Drive, the storage unit on Summer Avenue, and Brannick Drive where the victim's body was found.

Mr. Hathaway testified that he and his wife accompanied the Defendant to view the victim's body at the funeral home. He said that the Defendant stumbled back and seemed upset. On the ride back in the Hathaway's car, the Defendant spoke to someone on his cell phone and said, "'[Y]eah, it was Tina. Yeah, I've got closure now.'" Mr. Hathaway thought that this comment was odd because the victim had just been murdered.

On cross-examination, Mr. Hathaway acknowledged that he did not hear the entire conversation between the Defendant and the police officer on Saturday night. He agreed that if his wife was missing, he would be more concerned about finding her than about storing his collector cars. He conceded that the Defendant's statement about closure could be interpreted in different ways.

Sean Lester, the Director of Investigations and Technical Services at Forensic Medical, testified that on Monday, October 27, 2008, he went to the Bartlett Police Department to examine a black Chevy Avalanche that had been towed from the crime scene. He said that the truck bed contained two coolers and either picnic tables or chairs. He observed a pair of woman's shoes "placed side by side in order" under the steering wheel. On the passenger side, Investigator Lester found an open glove box and center console with various items strewn on the passenger seat and floor. He said that the victim was on the floor between the front and rear seats and that her body was partially covered with two towels. The victim's hands were loosely bound together with duct tape. Her head was tilted toward her chest and there was a piece of duct tape from her chin to her blouse. Because the space between the seats was very tight, the Bartlett police had to remove the center console to move the victim's body from the truck. Investigator Lester noted that the victim had two rings and one earring. He identified the photographs that he took during his investigation.

Detective Kevin Martin of the Bartlett Police Department testified that he was assigned to investigate the victim's homicide in October 2008. On Monday morning, October 27, he arrived at the crime scene on Brannick Drive and observed a parked black truck with an undamaged exterior. Upon closer inspection of the vehicle's interior, Detective Martin noticed a human leg protruding from underneath some towels. He banged on the truck's windows but the victim was unresponsive. All the doors of the vehicle were locked and the truck was towed to the Bartlett Police Department. Detective Martin was able to retrieve an extra set of truck keys from the Defendant that afternoon.

In the back of the truck, Detective Martin found coolers and tables. He opened the cooler and found stagnant water and some drinks. He could tell that the contents were old based on the smell inside the cooler. He observed a pair of ladies' shoes on the front driver side of the truck. On the passenger side floor, there were receipts, an owner's manual, and some other glove box items. The victim's body was confined to a small space in the backseat floorboard with her legs on the driver side and her head on the passenger side. Detective Martin said that he had to disassemble the center console to remove the victim's body from the truck. Bartlett police detectives and MPD officers processed the interior and the exterior of the vehicle for fingerprint and DNA evidence. He stated that the police did not find the victim's purse, phone, or other personal items in the truck.

Detective Martin interviewed the Defendant at the Bartlett police station on Tuesday, October 28 for about an hour and a half. The Defendant reported that on Friday night, he and the victim met at Lowe's to shop for appliances for a new house that they were purchasing. The Defendant said that he was driving his red Corvette and the victim drove the Avalanche. The Bartlett police later obtained the Lowe's surveillance video and confirmed that the two vehicles were in the parking lot from about 4:00 to 6:00 p.m. The Defendant explained that he and his wife were trying to purchase a new home and that he had planned on surprising the victim with the closing that night. He stated that the closing did not happen because there were difficulties with the financing and the paperwork. The Defendant said that he was in charge of the home purchase and that his wife was not involved.

The Defendant told Detective Martin that he last spoke to his wife early on Saturday morning while she was getting ready to go out. He observed that she was in bed talking on the phone, but he was mostly occupied with yard work and other chores outside. The Defendant said that he did laundry, purchased gas for his lawn equipment, worked on the battery of his motorcycle, and fixed a wire in the Avalanche. The Defendant could not specifically recall when he last saw his wife. He said that he never wore a watch and estimated that the victim left sometime between 10:50 a.m. and noon. Detective Martin testified that the Defendant did not ever advise the Bartlett detectives that his neighbors across the street had a surveillance video which showed when the Avalanche left the house. At the time that the victim left the house, the Defendant said that he was doing chores and working on either the pool or the hot tub.

The Defendant further stated that while his wife was running errands, he was at the Hathaways' house working on his Chevelle until about 4:00 p.m. He said that Ms. Hathaway came out of the house to the garage area to ask whether the Defendant should go get ready in order to pick up the Hathaways at 5:00 p.m. for the party. The Defendant said that he did not realize anything was wrong until people at the party called him inquiring about the victim's whereabouts. He started calling his wife at around 4:20 or 4:30 p.m. but she did not

answer.  The Defendant said that he became worried and called some individuals to see if they had been in touch with the victim.  He also went to some locations where she was supposed to have gone to that day.  The Defendant told Detective Martin that his wife was "[n]otoriously late[.]"

The Defendant explained the search process in detail.  He said that he finally made a police report late Saturday night.  He stated that Corvette Club members "basically set up shop at his house" and monitored the victim's credit card and phone accounts but they did not detect any activity.  The club members and the Defendant broke into groups and searched different areas and went to all the various police departments.  The Defendant said that he had to go to the Appling Farms police station three times regarding his missing person report.  Detective Martin testified that he and the Defendant explored various scenarios about what may have occurred, including road rage, disputes with neighbors, financial motives related to the victim's profession, and family members.  He said that the Bartlett police investigated all the potential situations and followed-up on the information provided by the Defendant.  The police obtained the surveillance videos from various businesses but did not observe the Avalanche or the victim in the videos.  Detective Martin said that they also investigated all of the information provided from calls to the police department.

Detective Martin recalled that the victim was found with two rings and earrings.  One of the rings had a very large square cut diamond and the other was a gold ring with diamonds.  During the interview, the Defendant had described his wife as "flashy," and he was very specific about the expensive jewelry that she owned.  The two rings matched the description provided by the Defendant in his interview.  The Defendant had stated that the rings were valued at roughly $30,000.  Based on  his twenty-three years in law enforcement, Detective Martin ruled out robbery as the cause of the victim's death because the valuable rings were still on her fingers.  He explained that the Avalanche had been parked at the side of the road whereas vehicles involved in robberies are frequently taken to commit other crimes and are usually "trashed" or "stripped" of anything useful.

After exhausting every lead, Detective Martin said that the police began to investigate the Defendant and the Caronnas' finances.  Based on surveillance of the Defendant, the police learned that he had cashed a $30,000 annuity check. After further investigation, Detective Martin suspected the Defendant of fraudulent business practices, and he contacted the federal authorities.  The police also learned of a potentially ongoing relationship between the Defendant and Becky Black.  Detective Martin said that "everybody was a suspect" and that Ms. Black was cooperative.  Ms. Black later contacted the police department and agreed to record her conversations with the Defendant.  Detective Martin stated that Ms. Black eventually became too scared to cooperate.  In one of her meetings with the Defendant,

Detective Martin observed the Defendant hand Ms. Black several notebook. Ms. Black then provided these pages to the police.

Detective Martin said that a warrant was issued for the Defendant's arrest on Sunday, March 8, 2009. After the initial interview on October 28, 2008, Detective Martin met with the Defendant at least three times. Once the arrest warrant was issued, the Defendant ceased all contact with the Bartlett Police Department. Detective Martin stated that he was unable to locate the Defendant until a Crime Stoppers tip led the police to a motel in Jackson, Tennessee about two weeks later. Detective Martin took the Defendant into custody and drove with him to Bartlett.

During the lengthy interview at the Bartlett Police Department, the Defendant denied any involvement in his wife's murder. Detective Martin testified that he knew the Defendant did not view appliances at Lowe's on Friday night based on the surveillance. The police had contacted the realtor and learned that the Defendant could not have had a surprise closing that night. When confronted about Saturday morning, the Defendant admitted to shuffling his cars but said that he brought the Avalanche into the garage to fix a wire in the seat heater. The Defendant never mentioned the security camera at the home of Jeffrey and Cindy Cox. Detective Martin said that the Defendant "would never answer" when asked about how the Chevelle got to his house from the storage unit. When asked again, the Defendant said he did not remember. Then he said that the Chevelle was already at the house. Regarding the house purchase, the Defendant stated that he was trying to find a lower rate and that he had endorsed and cashed the annuity check as a down payment on the home. He denied pursuing a long-term relationship with Becky Black, and he did not want to discuss the notebook pages that he had given her.

Special Agent Donna Nelson, a forensic scientist with the Tennessee Bureau of Investigation (TBI), testified as an expert in the field of serology and DNA. In the instant case, she analyzed the victim's blood sample; the victim's fingernail clippings; swabs from the victim's shirt with duct tape attached; two sets of the victim's clothing; and the victim's car. Specifically, there were swabs taken from the seat control, steering wheel, gear shift, and exterior and interior door handles. Agent Nelson used the victim's blood sample and saliva samples from the Defendant and Becky Black to generate their DNA profiles. She said that tests confirmed the presence of the victim's blood in the Avalanche and on the victim's shirt with the duct tape attached. The Defendant and Becky Black were excluded as donors of the genetic material found on the victim's shirt. Agent Nelson said that the partial DNA profile found on the duct tape matched that of the victim. She stated that the swab from the seat control switch consisted of a mixture of genetic material and that there was insufficient information to determine the match, though the Defendant and Becky Black could not be excluded as donors. Testing indicated that the Defendant was the major

-15-

contributor of genetic material found on the steering wheel. The results were inconclusive as to the minor contributor of material on the steering wheel, though Becky Black was excluded as a donor. Agent Nelson stated that the Defendant and Becky Black could not be excluded as contributors to the genetic material from the gear shift. She said that the victim was the major contributor of the DNA profile from the handle inside the left front door and that Becky Black was excluded as a donor.

On cross-examination, Agent Nelson stated that DNA may degrade due to exposure to the elements, heat, dirt, and sunlight. She agreed that she could not obtain DNA profiles from the exterior door handles on the left side of the vehicle. She said that through testing, she could determine whether genetic material was present but not when the material was left. She explained that "cannot exclude" means that there may have been information consistent with a certain genetic profile but that the information was not above the "calling threshold" to make a determination. Agent Nelson said that an individual is a "major contributor" when that person's DNA profile is more apparent than another person's DNA. She agreed that DNA analysis could not determine the identity of the person who had last touched an object. She said that it was possible to test the victim's earrings and two rings for genetic material but that she did not recognize the jewelry. She stated that only the victim's DNA was found beneath the victim's fingernail clippings.

Dr. Karen Chancellor, an expert in the area of forensic pathology, testified that she performed the victim's autopsy and determined the cause of death to be asphyxiation. She explained that asphyxiation can be caused by strangulation, where the blood vessels supplying oxygen to the brain are compressed; suffocation, where a person's nose and mouth are covered by another object; and positional asphyxia, where the chest or neck is positioned in a way such that breathing is inhibited. Dr. Chancellor said that in the instant case, each of these three mechanisms of asphyxiation was possible. Positional asphyxia may have caused the victim's death because her body was found wedged between the front and back seats of the truck. The victim could have been strangled because she "had some areas of darkening in the strap muscles of her neck[.]" Finally, suffocation involves compression of the nose and mouth, and "there may be no marks on the body at all." Dr. Chancellor stated that placing a plastic bag over a person's head may cause death by asphyxiation. She said that the person "could become unconscious in forty seconds to a minute" and that death would occur "after a few more minutes[.]" In the case of strangulation, she explained that compression of the neck arteries would result in unconsciousness "in just a few seconds" but that the hold must be maintained for about three minutes to cause death. She did not find any fingertip bruising or other external markings on the victim's neck.

During the autopsy, Dr. Chancellor noted that the victim's body was in "an early state of decomposition[.]" She was able to easily remove the pieces of duct tape found wrapped

loosely around the victim's right wrist and attached to the right side of the victim's face. Dr. Chancellor found several bruises on the victim's body including three parallel bruises on the front of the victim's left forearm, several on the back of the left arm, one on the right buttock, several bruises on the front left hip, a small bruise on the right elbow, and several small bruises on the inner part of the right thigh. She said that bruises may occur after death, though such bruising would be unusual. There were also markings on the victim's left side which matched the pattern of the truck's floor mats and which were caused by blood settling in the body. The victim had a broken fingernail on the right index finger and a broken toenail on her right foot. Dr. Chancellor observed that the victim was wearing earrings as well as a ring with clear stones on each hand. She did not document any difficulty in the removal of the rings. Dr. Chancellor identified several photographs that were taken during the examination. She opined that the manner of death was homicide.

Stephanie Dodson testified that she processed closing documents at Edco Title. In the fall of 2008, she was involved with the closing on a new house for the Caronnas. She stated that the closing was tentatively scheduled for September 25, 2008, but it did not occur because she was unable to get in touch with the buyers or obtain their loan information. She contacted the victim at one point but was directed to speak to the Defendant because "he was handling everything." Ms. Dodson kept a record of her attempts to contact the Defendant. On September 19, 2008, she spoke with the Defendant and noted that he did not have a lender yet. On October 24, she left a message for the Defendant seeking his lender and homeowner's insurance information. She testified that the information was required for the closing to occur. Ms. Dodson never obtained the necessary information, and she denied that there was a closing scheduled on October 24, 2008.

Mary Ann Tapp testified that she was the real estate agent for the new house that the Defendant wanted to purchase. She said that the purchase price of the home was $440,000 and that the contract was finalized on September 3, 2008. Ms. Tapp stated that apart from the signed contract, a mortgage and insurance were necessary for a closing to take place. She attempted to contact the Defendant on numerous occasions in September and October 2008 regarding the home purchase. She was motivated to close on the house because she worked on commission. She said that she returned the Caronnas' calls when they left messages. She was unsuccessful in obtaining lender information from the Defendant, and the closing never occurred.

Brad Whitener testified that he had known the victim since 1986 and that they had worked together at various financial institutions before he hired her to work at Cantor Fitzgerald, an investment banking company. He said that he worked in close proximity with the victim in a team setting and that the victim was a vice president with a $200,000 salary. He stated that the Defendant was frequently at the office and would bring flowers to the

victim. The Defendant would constantly call the victim's office phone and then her cell phone if she did not answer the land line.

According to Mr. Whitener, the victim was "very excited" about purchasing a new house. He said that the victim was frustrated with the various delays throughout the process, including issues with the builder, the lender, and the realtor who would never call the Caronnas back. He last saw the victim on Friday, October 24 and recalled that she was supposed to close on the house on Monday, October 27. Mr. Whitener said that the victim had planned on attending a conference that Tuesday and then returning on Thursday or Friday to move into the new house. He saw the Defendant on the Friday before the victim disappeared because the Defendant came to the office to photocopy the homeowner's policy for the new house. He observed that the victim "was quite upset" though he did not know why. The victim spoke with the Defendant outside of the office and then appeared normal after she returned thirty minutes later.

At around 9:00 p.m. on Saturday, October 25, the Defendant called Mr. Whitener and asked if the victim may have run off with someone from the office. The Defendant also asked if the victim's work cell phone had GPS capability, and Mr. Whitener told him that it did not. Early on Monday morning, the Defendant arrived at the office and wanted to go through the victim's computer and personal things. Mr. Whitener said that he called the Defendant later that day, but the Defendant told him that it was not the victim's body that was found in the truck.

Dr. Thomas Crenshaw testified that he was the victim's OB/GYN physician from her pregnancy to the end of her life. He said that the victim had also participated in a pharmaceutical study in 1998, which required monthly visits to his office for about two years. He stated that the Defendant accompanied the victim in the examination room during the "vast majority" of her appointments. Dr. Crenshaw said that husbands sometimes accompanied their wives to pregnancy-related visits but that they were rarely there for routine appointments. He acknowledged that the Defendant's presence did not appear to cause any problems for the victim.

Cheryl Brady testified that she was a close friend and former co-worker of the victim. During their conversations, the victim told Ms. Brady that she was distraught about her estrangement with her mother. However, the victim was happy once she began to e-mail her mother again. The victim told Ms. Brady that she did not want the Defendant to find out about the e-mails. She also told Ms. Brady that she and the Defendant did not have any debt on their house or their cars.

Brenda Berlin testified that she had known the victim for over twenty years and that they were co-workers at Cantor Fitzgerald. The victim sometimes told Ms. Berlin that she wished she could go to the grocery store and to doctor's appointments without the Defendant. The victim also wanted to spend more time alone with her son. According to Ms. Berlin, the victim would discuss her frustrations with her home purchase at work. The victim had mentioned that the realtor would not return the Defendant's calls, and she thought that the closing was supposed to occur in the first week of October 2008. The victim subsequently believed that the closing would take place in mid-October and then, after that, at the end of October.

Ms. Berlin said that at around 7:00 p.m. on Saturday, October 25, the Defendant called her inquiring about the victim and stating that the victim had not returned from Costco. She thought it was odd that the victim had gone to the store alone because the Defendant accompanied the victim to most places. She then searched the victim's office desk on Sunday at the Defendant's request. A few weeks after the victim's funeral, the Defendant came to the Cantor Fitzgerald office and told Ms. Berlin that he thought the victim's death was gang-related and that there had to have been at least two perpetrators because the victim was heavy. The Defendant also told her that the victim's mother had repeatedly called the police station and "kept throwing him under the bus."

On cross-examination, Ms. Berlin testified that she sometimes went on overnight trips with just the victim. She said that the victim appeared normal on Friday, October 24. On Saturday, she and her husband drove to various places, including the home of the victim's mother, to search for the victim. She stated that the victim did not seem upset whenever the Defendant visited or brought flowers to the office.

Carrie Brown, a lifelong friend of the victim, testified that the victim was "very down" and "not herself" when they had dinner together on the Tuesday before the victim's death. Ms. Brown said that the victim was sad about the estrangement with her mother, though she was elated that they had recently been in touch. The victim told Ms. Brown that the Defendant could not find out about the communication. She also told Ms. Brown that the current house was free of debt and had been sold. Ms. Brown said that the victim was excited about the new house when they spoke on the phone that Thursday. She learned that the victim was missing when the Defendant called her on Saturday evening.

Ms. Brown testified that in 2006, she invested $20,794.82 with the Defendant for an annuity with Allianz. She said that the Defendant instructed her to write the check to Caronna Investments rather than to Allianz. In March 2008, she called the Defendant to request $10,000 from her annuity, and he attempted to talk her out of the withdrawal. After about three weeks, the Defendant apologized for the delay and obtained Ms. Brown's

banking information for a wire transfer. Ms. Brown assumed that the $10,000 in her bank account was from Allianz but later learned that her money had never been invested in Allianz. She did not have any suspicions regarding her money until after the victim's death. She also had a life insurance policy with Allianz that the Defendant had handled without any issues. While going through the victim's belongings, Ms. Brown found a roll of gray duct tape, which she gave to the Bartlett police.

Donna Marr, the victim's family friend, testified that she invested nearly $30,000 with the Defendant to create retirement funds with Allianz. She identified three separate checks written to Caronna Investments per the Defendant's instructions. The Defendant had also instructed her to leave the memo line of the checks blank. Ms. Marr first became suspicious when she received an IRS statement in January 2009 regarding back taxes owed on one of the checks. She later learned that her three checks were never invested in Allianz.

Michael Roper testified that the Defendant had handled his investments for about ten years. He identified nine checks totaling nearly $130,000 that he had written to Caronna Investments to purchase annuities from either Jefferson Pilot or Allianz. Mr. Roper also identified a check payable to him from Allianz for a withdrawal of $13,800. He stated that he had neither requested the withdrawal nor endorsed the check. He later discovered that his checks for annuity products were never sent to the investment companies.

Bruce Black testified that he and his wife, Becky, had known the Caronnas for about ten years and had frequently socialized with them. As a business owner, he purchased annuities from the Defendant for four of his employees. He also wrote a check for $25,000 payable to Caronna Investments to purchase an annuity for his grandson. Mr. Black said that he became concerned about his investments when the Defendant failed to produce Allianz documents despite repeated requests. After receiving separate lists from the Defendant and from Allianz regarding his annuities, he noticed a discrepancy in two checks. He discovered that he was missing the annuities for his grandson and for one of his employees. On cross-examination, Mr. Black acknowledged that he had invested with the Defendant despite his suspicions of an affair between his wife and the Defendant.

Retired postal inspector Thomas Terry testified that he investigated instances of financial fraud involving the Defendant. He said that he became the case agent after the Bartlett Police Department provided evidence to him. After interviewing victims and collecting evidence, Mr. Terry discovered a pattern of fraud in which checks written to Caronna Investments were deposited into the Defendant's personal account and never forwarded to the appropriate insurance companies. In addition, some of the victims received fraudulent documents and reported unauthorized withdrawals from their insurance accounts into the Defendant's bank account.

Mr. Terry identified various documents recovered from the Defendant's business office and Hummer. Specifically, he identified checks from Matt Struna, Carrie Brown, Donna Marr, Michael Roper, and Bruce Black that were written to Caronna Investments and deposited into the Defendant's bank account. In one instance, Mr. Terry discovered evidence of a wire transfer of $10,000 from the Defendant's account to Carrie Brown with a note stating, "From Allianz." He also found a record of a withdrawal request for $13,800 from the annuity of Michael Roper and a corresponding Allianz check payable to Michael Roper. He testified that the signature on the withdrawal request did not appear to be Michael Roper's, and the $13,800 check had been deposited into the Defendant's bank account. Mr. Terry further identified a withdrawal request for $30,000 from the victim's annuity that was submitted to Allianz on October 15, 2008. He stated that the victim's signature on the request form did not appear to be authentic. Allianz subsequently sent a $30,000 check payable to the victim, which was endorsed and deposited on November 4, 2008. Mr. Terry said that the victim did not endorse the check.

In reviewing the seized records, Mr. Terry also found a mortgage application dated October 6, 2008, which reflected that the Caronnas owed over $160,000 for the mortgages on their two existing homes. He identified a document titled "Estate Information," which listed debts owed in the amount of $250,000 as well as the victim's life insurance valued at $140,000.

Lisa Jones, an investigator with Jefferson Pilot, testified that she began to examine the Defendant's business activity after receiving a complaint from customer Michael Roper. After reviewing the original documents on file with her company, she discovered that the Defendant had provided altered statements to Mr. Roper. She described various irregularities in a policy statement, including incorrect dates and monetary figures, different fonts, missing statement periods, and sections that were left blank due to correction fluid. She noted that authentic documents from Jefferson Pilot would not include blank sections.

Lori Wells, an Allianz investigator, testified regarding the discrepancies between documents involving the Defendant and those generated by her company. She examined a purported annual statement from Allianz and noted that it was missing a policy number and a statement period. She identified other annual statements that had omitted the issue date and used irregular font. Although one statement was for 2006, the statement period listed 2004 to 2005 as the year of coverage. She said that Allianz statements would not contain these irregularities.

Patrice McKnight testified that she handled legal matters and was a custodian of records at Verizon Wireless. She identified the phone records that had been kept for the Defendant, the victim, and others during the weekend of the victim's disappearance. She

stated that on Saturday, October 25, the Defendant called the victim's cell phone twice, at 4:12 p.m. and 4:44 p.m. The Defendant then called the victim's work cell phone at 5:36 p.m.

Special Agent Scott Eicher of the FBI testified as an expert in the field of historical cellular analysis. In the instant case, he reviewed the cell phone records for the Defendant's Verizon account and a list of cell tower sites in the area to map the phone's usage during the specified period of time. He explained that cell tower coverage overlaps to prevent dropped calls and that cell phones constantly measure signal strength from surrounding towers to select the one with the best signal. Agent Eicher identified a map that he produced which depicted the coverage from certain Verizon cell towers as well as points of interest including Brannick Drive, Eatonwick Drive, and Bruton Parish Drive.[1] He stated that at 11:22 a.m. on October 25, 2008, the phone in question used tower 149 to make a twenty-seven-second call.[2] He agreed that this call could have been made from the Eatonwick address. The next call was placed at 12:21 p.m. and also used tower 149. Less than a minute later, a third call was made using tower 571, which was southwest of tower 149. Agent Eicher explained that the phone had to have moved in order to switch coverage between the two cell towers. He identified the Brannick address as being further west on the map and in the area of tower 571. Based on the records, he could determine the general area of the phone but not its precise location. He said that the phone could not have used tower 571 if it were moving from Eatonwick to Bruton Parish Drive because another tower covered that area and because Bruton Parish Drive was in the opposite direction. There was a fourth call that day at 3:45 p.m., which used tower 568, located near the Bruton Parish address.

Karen Bean testified that she met the victim at a work conference in 2003 and that they had remained close. At the victim's funeral, Ms. Bean hesitated in embracing the Defendant because she noticed that he had a lot of makeup on his shirt collar from hugging many tearful women. She told the Defendant that she did not want to further ruin his shirt because she had been crying. She said that the Defendant responded, "'[W]ell, it's not like I have a wife to bother me about that stuff anymore.'"

Donna Kidwell of Kellon Insurance Agency testified that she shared an office building with the Defendant, whom she had known for six years. She said that about three or four months after the victim's death, the Defendant asked her to set him up on some dates. Ms. Tidwell arranged two dates for the Defendant.

---

[1] The record reflects that the victim's truck was found on Brannick Drive; the Caronnas' house was on Eatonwick Drive; and the Hathaways lived on Bruton Parish Drive.

[2] The phone records identified by Verizon Wireless employee Patrice McKnight indicate that this call was made to Gary Hathaway's number.

Dana McBride, a Kellon Insurance employee, testified that in February or March 2009, she had gone out after work with the Defendant and some co-workers to cheer up the Defendant. After the Defendant said that the victim had died from asphyxiation, Ms. McBride asked him whether the victim had been strangled or smothered. The Defendant said "'smothered'" and Ms. McBride commented, "[W]ell, that makes me feel like it was someone that cared about her." The Defendant asked her why she would say that, and Ms. McBride responded, "[B]ecause that would be the less painful way to die. It would be like falling asleep." She testified that the Defendant then stated, "'[D]o you have any idea how long it would take to smother someone?'" After Ms. McBride said no, the Defendant abruptly responded, "'four to six minutes.'" The Defendant had also mentioned that he had been cleared by the police.

Janet Vanelli testified that she worked at Kellon Insurance Agency from 2000 to the end of 2008. During that time, she became acquainted with the Defendant through a co-worker. She said that he would visit the office two or three times a week to chat with everyone. The Defendant also purchased his personal insurance policies through Kellon Insurance. In May 2002, Ms. Vanelli had a one-time affair with the Defendant while she was going through a divorce. The Defendant told her that he was in a loveless and sexless marriage.

Ms. Vanelli said that on Friday afternoon, October 24, 2008, the Defendant came to her office to discuss the purchase of homeowner's insurance for a new house. She stated that the closing was scheduled for Monday, October 27, but the Defendant did not have the necessary lender information on Friday for her to write a policy. Ms. Vanelli told the Defendant to call her with the information first thing on Monday morning so that she could fax the proof of insurance to him. She testified that proof of insurance was necessary to obtain a mortgage and to complete the closing. She said that the Defendant could have closed on Monday, October 27 if he had provided her with the mortgage information. She never received the lender information from the Defendant. That Friday afternoon, the Defendant had also told Ms. Vanelli that he suspected the victim of having an affair. He then stated, "'I don't care if the bitch is or not.'"

After Ms. Vanelli learned that the victim's vehicle had been found, she went to the Defendant's house on Monday afternoon to console him. She noticed a smell of bleach at the house and the Defendant told her that he had broken something and had cleaned it up. After the visit, the Defendant walked Ms. Vanelli to her car and voluntarily stated that he did not kill the victim.

Ms. Vanelli testified that about two weeks after the victim's death, the Defendant came to the Kellon Insurance office to ask if she and some of her co-workers could help

clean out the victim's closet. Ms. Vanelli and five other women then went to the Defendant's house to gather the victim's things for a charity sale. According to Ms. Vanelli, the Defendant wanted everything gone except for the victim's jewelry box, which was full jewelry. At one point, the Defendant took the victim's Bible from one of the women and threw it in the trash, stating that the victim would no longer need it. Ms. Vanelli said that they retrieved the Bible from the garbage can and sent it to the victim's mother.

In late February 2009, Ms. Vanelli said that the Defendant came to the Kellon Insurance office on a Friday morning to review some policies. She saw the Defendant walk outside the glass doors to the parking lot. Although it was a cold day, she could see the Defendant "sweating, pacing, and talking on the phone at the same time." The Defendant then returned to the office and told everyone that he had to leave because the Bartlett police had just called and wanted to speak with him. Ms. Vanelli then had a brief phone conversation with the Defendant the next day. The Defendant told her that he was in St. Louis for a friend's funeral and that he would see her on Monday. After that, Ms. Vanelli did not have any contact with the Defendant.

Tim Kellon, the president of Kellon Insurance Agency, testified that he and his father had arranged to meet the Defendant on the morning of February 27, 2009, to discuss annuity products. He stated that the Defendant canceled the meeting after receiving a call that morning. The Defendant appeared concerned and said that he had to leave to speak with the Bartlett police. Mr. Kellon testified that after that day, he never saw or heard from the Defendant again.

John Bowers testified that he was currently a federal inmate serving a fifteen-year sentence for a methamphetamine-related conviction. In November 2010, he shared a holding cell with the Defendant in Memphis where they had an eight-hour conversation. Mr. Bowers said that he had been "ranting and raving" for forty-five minutes about killing his ex-girlfriend when the Defendant stated that he was charged with murder. Mr. Bowers then asked the Defendant, "[H]ow do you kill somebody with all the CSI and all the other technology[?]" The Defendant responded, "'[S]uffocate them. You put a bag over their head.'" He told Mr. Bowers that he had been arguing with the victim for about a month and then he "snapped." The Defendant said that the argument began in the house and "escalated all the way back to the garage[,]" and as the victim got into the truck, he "duct taped her and put a bag over her head." The Defendant then parked one of his antique cars on the street "because the neighbor had a camera pointing towards his driveway" and he "snuck back" to the garage and left in the truck. He then "dropped [the victim] off behind the driving license place over there off of Summer." He told Mr. Bowers that he "paid somebody thirty or forty dollars" for a ride back to his house in the Countrywood subdivision. The Defendant then drove to a friend's house to work on his car. He told Mr. Bowers that he had "messed up and

-24-

left [the victim's] jewelry on." The Defendant also said that he kept six cars in storage and owned two houses.

Mr. Bowers testified that he attempted to tell his federal lawyer about the Defendant, but the lawyer was not interested and told him that the information would not help his case. Mr. Bowers was incarcerated in Louisiana when he read about the district attorney's re-election campaign in Memphis. After obtaining the name of the prosecutor in the Defendant's case, Mr. Bowers wrote a letter in spring 2012 and sent it to the district attorney's office. He acknowledged that the Defendant could have lied to him, but said that his letter was based on what the Defendant told him. He stated that he wrote the letter because he "just wanted to get it off [his] chest and plus maybe help [him]." He denied that anyone in the State had at any time offered to help with his case. On cross-examination, Mr. Bowers testified that he had not been promised anything, though it would be "nice" if his federal sentence were reduced based on his cooperation.

Deputy Jeffrey Davis of the United States Marshall Service testified that John Bowers and the Defendant had been prisoners together in Memphis on November 16, 2010, when they had both been transported from Shelby County Jail to a federal cell block. He said that the two men would have been at the federal building all day while waiting to go to court that afternoon.

Steffany Black, the daughter of Bruce and Becky Black, testified that the Caronnas had been her close family friends. Steffany[3] said that she began to suspect an affair between her mother and the Defendant, and she confronted her mother on the phone a few months before the victim's death. She could hear the Defendant's voice in the background, and her relationship with her mother deteriorated. She mended her relationship with her mother right before the victim's death. However, she did not get along with the Defendant.

Steffany said that she tried to console the Defendant after the victim died, and their relationship improved. She and the Defendant went shopping and out to dinner together. She testified that shortly after the victim died, the Defendant wanted to shop for new items to redecorate the house. When they were together, the Defendant attempted to convince Steffany that he would be a better father and that her mother should leave Mr. Black to be with the Defendant. Steffany felt awkward about these conversations, but they became a daily occurrence. When she asked about developments in the victim's murder case, the Defendant calmly stated that he was not concerned about finding the robbers because "'Tina wasn't coming back, and it wouldn't change anything.'"

---

[3] Some of the witnesses in this case share the same surname. To avoid confusion, we will address Steffany Black by her given name. In doing so, we intend no disrespect.

In January 2009, Steffany went to the casino with her parents, her former boyfriend, and the Defendant. She said that the Defendant followed her and her mother to the slot machines where he urged Ms. Black not to go on an upcoming cruise with Mr. Black. Steffany observed the Defendant "getting upset, angry and frustrated" because he wanted Ms. Black to leave her husband that night. She and her mother then left the casino. After her parents went on the cruise, Steffany said that the Defendant would call her, text her, and show up at her house to persuade her to break up the Blacks' marriage. She stated that the Defendant's communication "was annoying at first," but she became scared after receiving multiple missed calls, text messages, and voicemails from the Defendant. She then stayed at her cousin's house to avoid the Defendant. The Defendant continued to contact Steffany and she had the impression that he was following her. She was scared at that point and ignored all of the Defendant's calls and texts. While her parents were still out of town, Steffany told her mother about the constant contact from the Defendant.

Becky Black testified that she and the Defendant had an affair for about ten years until early 2009. Throughout their relationship, they would meet about three or four times a week. Ms. Black said that she and her husband continued to socialize with the Caronnas during the affair. She testified consistently with her daughter regarding the Defendant's unusual behavior at the casino. According to Ms. Black, the Defendant insisted that she leave her husband that night. She said that the Defendant was "frustrated" and "raised his voice" after she repeatedly refused to leave. Before her cruise ship departed, Ms. Black had a phone conversation with the Defendant in which he was "very forceful" that she get off the ship and leave. During the cruise, she felt "real nervous and scared" after a phone conversation with her daughter, Steffany. When she returned, Ms. Black and her daughter went to the Bartlett police station.

After speaking with the police, Ms. Black agreed to record her conversations with the Defendant. She later used a device to record approximately six phone conversations. She also wore a wire during a meeting with the Defendant on February 26, 2009. During her testimony, Ms. Black read to the jury an eight-page list written by the Defendant of what she contributed to their relationship.[4]

---

[4] The list includes, in part:

Makes me a better man, never pressure [sic] to do anything, she is my angel, can never be mad at, this is hard to explain, could be with forever, always excited to see like a first date every time, need to be loved right, needs to be most important person to someone, want her for just her, not anything else, she is my soul mate and if she tries can tell what I'm thinking, . . . No matter what is wrong or how bad makes me feel all will be okay. Money, cars, toys, not important, but people are.

On cross-examination, Ms. Black testified that before the victim's death, she had been willing to leave her husband to be with the Defendant. She acknowledged that her husband was an alcoholic but denied that he was abusive. She admitted that she continued to see the Defendant after the victim's death. She also admitted that she had driven the Chevy Avalanche on prior occasions. Before the victim's death, Ms. Black believed that the Defendant would leave the victim, though he wanted her to leave her husband first. She agreed that the Defendant had created the list at her request. She acknowledged that the Defendant had always denied being involved with the victim's death. Ms. Black conceded that she took tens of thousands of dollars from her husband but said that she was saving the money to leave him.

Chris Cozier of the United States Marshall Service testified that he assisted the Bartlett police in apprehending the Defendant on March 26, 2009, in Jackson, Tennessee. He said that he assembled the members of his fugitive task force to locate and arrest the Defendant, who had been staying at a motel. After he was unable to open the Defendant's door with a master key, Marshall Cozier stated, "[R]oom service." When the Defendant said that he did not order room service, law enforcement knocked and announced their presence. The Defendant responded, "'I have a gun.'" The police then attempted to calm the Defendant down, and he opened the door after fifteen minutes. The Defendant was wearing a concealment holster on his belt, and there was an automatic handgun on his bed. The Bartlett police then took the Defendant into their custody. Marshall Cozier said that the Defendant was driving a Hummer at the time.

After the close of the State's proof, the defense moved for a judgment of acquittal on the grounds that the State had failed to present sufficient proof of premeditation. The trial court overruled the motion.

**Defense's Proof.** The Defendant elected not testify at trial. Patricia Turner, a Corvette Club member and wife of Douglas Turner, testified that the victim came to her house on Friday, October 24, 2008, to pick up some items for the dinner party on Saturday. That afternoon, the victim told Ms. Turner that she had cashed an insurance policy to pay toward the closing on the house that was scheduled for Monday.

Gina Caronna, the Defendant's sister, testified that the victim was very intelligent and outgoing. She said that the victim was aware of the Defendant's affair with Becky Black and had confronted the Defendant many times. Despite the occasional fights, the victim called the Defendant "her Joe-Joe" and the two were inseparable. When Ms. Caronna saw the Defendant on Monday evening after the victim's body had been found, the Defendant "had a complete breakdown" and was "hysterical." At the initial viewing of the body, the Defendant "collapsed" and was "extremely upset." Ms. Caronna stated that the Defendant

liked children and "was always very good" to her three children. She said that the Defendant's garage was "full of things" but was neat.

Jennifer Caronna-Smith, the Defendant's younger sister, testified that the Defendant was "very upset" when she saw him on Tuesday evening after the victim's body had been discovered. Upon viewing the victim's body, the Defendant was crying and required support on both sides to stand. During this time, Ms. Caronna-Smith did not notice any scratches or bruises on the Defendant's arms. She stated that the Defendant had "a two car garage chock full of stuff." She had previously provided the Defendant with the wire shelves that lined the back wall of his garage. She said that the Defendant spoiled her children and that he was "the favorite uncle." Ms. Caronna-Smith described the victim as "super strong-willed" and very smart. She stated that the victim had been excited when discussing the purchase of the new home.

Elizabeth Benson, the Defendant's investigator, testified that she took photographs of the Avalanche's interior. She said that there was some old grass and a "shiny metal looking object" on the floorboard. She also took pictures and measurements of the Defendant's garage. The garage was measured to be twenty feet and four inches across, fifteen feet and four inches deep, and eight feet tall. She measured the length of the truck to be eighteen feet and five inches.

Michael Scholl testified that he was court-appointed to represent John Bowers in a federal drug case and that he remained the attorney of record. He said that federal prisoners may request a sentence reduction if they cooperate with the authorities. Mr. Scholl explained that the extent of the sentencing adjustment depended on various factors and that testifying "would obviously increase your ability to reduce your sentence." He stated that he had not discussed sentence reductions with Mr. Bowers regarding the Defendant's case and that Mr. Bowers had cooperated on his own. He said that, as a defense attorney, he would try to request as much of a reduction as possible for his client and that Mr. Bowers was "absolutely" familiar with time cuts.

Angelo Cobrasci testified that he was the maintenance manager at the storage facility where the Defendant kept his vehicles. He said that he did not see the Defendant at the storage facility on Saturday, October 25, 2008. However, he did see the Defendant the week before on either Thursday or Friday. On cross-examination, he said that owners could access their storage units with a key code even if he was not present.

Robert Davis of the Shelby County's Sheriff's Office testified that he examined the latent fingerprints submitted by the Bartlett police. He identified the Defendant's

fingerprints on the exterior left front door of the Avalanche. He said that there was also a partial palm print on the truck that he could not identify.

J.D. Owen of the Bartlett Police Department testified that he was one of the lead detectives in the instant case. His testimony was consistent, in large part, with the testimony of Detective Martin regarding the investigation of the victim's homicide and the Defendant's subsequent arrest in Jackson. As the case officer, Detective Owen was responsible for gathering evidence and compiling a report. He said that he had worked as a case officer on two prior homicides, and he agreed that the murder rate in Bartlett was lower than that of Memphis. During the processing of the truck at the Bartlett police station, Detective Owen collected DNA swabs after consulting with TBI Special Agent Donna Nelson. He did not recall swabbing the rear door handles.

Detective Owen acknowledged that he confronted Jeffrey Cox near the crime scene at Brannick Drive on the afternoon of Monday, October 27, 2008. He agreed that if the police had taken Mr. Cox into custody for questioning that day, they could have possibly learned about the surveillance video of the Defendant's driveway. He conceded that during his interview with Mr. Cox in March 2009, he suggested that the camera time may have been off by one hour due to daylight savings time. Detective Owen also acknowledged that Mr. Cox had initially reported seeing the red Chevelle leave some time after the truck, but then stated that Mr. Cox could not remember after being confronted with other evidence. Detective Owen said that the Defendant had a carry permit for the handgun that he possessed at the time of his arrest.

Officer Charles Watkins of the Bartlett Police Department testified regarding how he secured the crime scene at Brannick Drive and how he had maintained the crime scene log on Monday morning, October 27, 2008.

Special Agent Linda Littlejohn, a forensic scientist with the TBI Nashville Crime Laboratory, testified that she examined two pieces of duct tape found on the victim and a roll of duct tape. She concluded that the duct tape pieces did not come from the roll of duct tape.

MPD Sergeant Marcus Berryman testified that on Monday, October 27, 2008, he went to the Bartlett Police Department to assist in the processing of the Avalanche. He brought a crime site imager with him because the Bartlett police did not have this expensive piece of equipment. He said that the equipment detects untreated fingerprints. Sergeant Berryman did not go to the crime scene on Brannick Drive, but he said that he would have produced a crime scene diagram if it had been his investigation. While processing the truck, he stated that it bothered him to observe a Bartlett police supervisor reach into the vehicle and pick up a piece of paper without wearing gloves. On cross-examination, he acknowledged that

Memphis "definitely" has more homicides than Bartlett and that he has processed around 200 homicide scenes in his ten years working in crime scene investigation.

MPD Officer Bryan Shivley testified that he worked at the Appling Farms station desk in October 2008, though he did not remember handling the Defendant's missing person report. He agreed that if asked, he would probably respond that missing adults commonly return after their disappearance.

Joseph Underwood, a Corvette Club member, testified that the victim called him sometime before 1:00 p.m. on Saturday, October 25, 2008, while he was at work. The victim told him that she would come to his house after 4:00 p.m. to drop off some items for the party that night. Mr. Underwood assumed that he had received the call on his work phone because he did not have a record of the call on his cell phone. He told the Bartlett police about the phone call, but they said that he was a liar. He could not recall whether the police showed him copies of his cell phone records or if they said that they had them.

Poppy Underwood testified that the victim had planned to come to her house at lunchtime on October 25 to bring some food for the party. When the victim did not appear, she called her husband, Joe Underwood, at around 1:00 or 2:00 p.m. She learned that he had spoken with the victim who had decided to come by at 4:30 p.m. instead.

Roy Lemmon testified that he was leaving his house on Brannick Drive at 5:45 p.m. on October 25 when he observed a woman with short blonde hair in the driver's seat of a green and brown SUV. He thought it was unusual that the woman did not look at him or move.

Darlene Lemmon testified consistently with her husband. She said that the woman was "kind of heavy set" and was sitting in "a dark green small SUV." She thought it was odd that the woman just looked straight ahead without moving.

Carol McElya testified that she lived at the corner of Brannick and Elmore Road in Bartlett. At around 3:00 p.m. on October 25, 2008, she was seated in her driveway watching her daughter, Carley, ride a bike. She did not notice anything unsual on Brannick until her daughter nearly hit a "black truck SUV like vehicle" that was moving down the street. She then took her daughter inside and did not see where the vehicle went. On cross-examination, Ms. McElya conceded that she did not mention in her police statement that she saw the vehicle driving down Brannick.

Carley McElya testified that she was eight or nine years old in October 2008. She said that on the afternoon of October 25, she was riding her bike when she saw "a black

Avalanche that went into the cove but [she] didn't see it come back out." She stated that it was around 3:00 p.m. because she had to run some errands with her mother. She said that she had a sore throat and went back inside shortly after seeing the vehicle.

Juanita Myers testified that her Brannick Drive home had previously been burglarized so she paid attention to anything unusual in her neighborhood. She said that she did not observe anything strange as she and her family left for dinner at around 4:00 p.m. on Saturday, October 25, 2008. When they returned between 5:00 and 6:00 p.m. that evening, there was a dark SUV parked in front of their house. Her husband called the Bartlett police on Monday morning because the vehicle was still there. On cross-examination, she acknowledged that she told the police that it had been either Friday or Saturday. She said that her husband "kept trying to convince [her] that it was Friday or Saturday" but that she was always certain that it had been Saturday.

Stanley Myers testified consistently, in large part, with the testimony of his wife. He said that he did not like strangers parking on his street and that he did not see the black SUV at his property until after returning from dinner. When Mr. Myers called the Bartlett police on Monday morning, he learned that the vehicle's tag number matched that of a missing vehicle. He said that he and his wife had disagreed on the day in question and that he thought they had seen the vehicle on Friday night.

James Coleman testified that when he returned at 3:00 p.m. to his Brannick Drive home after work on October 25, 2008, he noticed the Avalanche parked on his street.

Mary Quon testified that she did not see anything unusual when she left her Brannick Drive home at around 11:55 a.m. on Saturday, October 25, 2008. When she returned an hour later, she saw a van on the street.

Harris Quon testified that when he returned home from a fishing trip at 8:00 p.m. on Saturday, October 25, he saw a truck that did not belong there on Brannick Drive. On Monday, he observed multiple squad cars investigating the truck on his street.

Erica Vinson, the Caronnas' next-door neighbor, testified that between 9:00 and 10:00 a.m. on Saturday, October 25, 2008, she was leaving to attend a homecoming in Jackson. She saw the victim in the driver's seat of the Avalanche at the end of the Caronnas' driveway. After speaking with the victim, Ms. Vinson left while the victim remained in her driveway.

**Rebuttal Proof.** Todd Gray, the victim's son, testified that the Avalanche could fit in the garage with enough room for the garage door to close. However, he never observed the Avalanche parked in the garage with the door closed.

Based on the above proof, the jury found the Defendant guilty as charged of first degree murder. The trial court sentenced the Defendant to life imprisonment in the Tennessee Department of Correction. After the denial of his motion for new trial, this timely appeal followed.

## ANALYSIS

**I. Right to Speedy Trial.**[5] The Defendant contends that his case should be dismissed because his right to speedy trial was violated. He asserts that the delay of three and a half years in his case prejudiced his defense and caused him to suffer oppressive pretrial incarceration. The State responds that the Defendant has not established a speedy trial violation and that the trial court properly denied relief. We agree with the State.

The Defendant was arrested in late March 2009.[6] Some eight months later, on November 12, 2009, the Shelby County Grand Jury returned an indictment charging him with first degree murder. The trial was originally set for March 21, 2011, but the parties agreed to a continuance until August 1, 2011. Thereafter, the State was granted a continuance and the trial was scheduled for January 23, 2012. On January 13, 2012, the State filed its motion for continuance for more time to independently obtain financial information relevant to Rule 404(b) after it discovered that documents from to the Defendant's pending federal case would not be available. On January 17, 2012, the Defendant filed a response that opposed the State's motion and requested that the trial court dismiss the indictment due to a violation of his right to a speedy trial.

After a hearing on January 17 and 18, 2012, the trial court granted the State's motion for continuance and denied the Defendant's motion to dismiss. In conducting its analysis, the trial court found that the length of the delay – which was thirty-four months at the time of the hearing – warranted further consideration of the speedy trial factors. However, the court did not find that the delay was excessive given the complexity of the case. The court

---

[5] We have re-numbered the Defendant's issues for clarity.

[6] We note that there are varying dates in the record regarding the specific day that the Defendant was arrested in Jackson, Tennessee. In his motion to dismiss for lack of speedy trial, the Defendant stated that he was arrested on March 24, 2009. In its "Order Denying Bond," the trial court noted, "The Defendant was eventually arrested at a motel in Jackson, Tennessee on March 25, 2009." At trial, United States Marshall Chris Cozier testified that the Defendant was arrested on March 26, 2009.

noted that the case involved a prosecution for first degree murder with unusual 404(b) evidence and "an astronomical number of witnesses." The trial court further noted that the Defendant had sixty-three federal indictments and that the parties in the federal case were still exchanging discovery. Regarding the reason for the delay, the trial court found a lack of due diligence on the part of the State in preparing its 404(b) proof, but it did not find evidence of an intentional delay. The court found that the Defendant had acquiesced to the initial continuances and that the Defendant asserted his right to speedy trial for the first time in January 2012. In considering the prejudice factor, the court observed that the Defendant would be in federal custody regardless of what it ruled. Finally, the trial court stated that the parties could request depositions for evidentiary purposes to minimize any potential prejudice. The trial subsequently began on October 22, 2012, and the Defendant was convicted and sentenced on November 1, 2012.

Both the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution guarantee an accused the right to a speedy trial. See U.S. Const. amend VI; Tenn. Const. art. 1, § 9. The right to a speedy trial is also statutorily protected in Tennessee. See T.C.A. § 40-14-101 ("In all criminal prosecutions, the accused is entitled to a speedy trial and to be heard in person and by counsel."). In addition, Rule 48(b) of the Tennessee Rules of Criminal Procedure provides that the court may dismiss the indictment if there is unnecessary delay in bringing a defendant to trial. Tenn. R. Crim. P. 48(b). "The purpose of the speedy trial guarantee is to protect the accused against oppressive pre-trial incarceration, the anxiety and concern due to unresolved criminal charges, and the risk that evidence will be lost or memories diminished." State v. Utley, 956 S.W.2d 489, 492 (Tenn. 1997) (citing Doggett v. United States, 505 U.S. 647, 654 (1992)).

The constitutional right to a speedy trial is not implicated until there is an arrest or a formal accusation from a grand jury. State v. Simmons, 54 S.W.3d 755, 758-59 (Tenn. 2001) (citing Utley, 956 S.W.2d at 491). When evaluating claims of a speedy trial violation, we apply the four-part balancing test set forth in Barker v. Wingo, 407 U.S. 514 (1972); see also State v. Bishop, 493 S.W.2d 81, 83-85 (Tenn. 1977) (adopting the Barker analysis in Tennessee). The Barker factors are: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the right to a speedy trial; and (4) the prejudice to the defendant because of the delay. Barker, 407 U.S. at 530; Simmons, 54 S.W.3d at 759. "The factors relevant to a speedy trial inquiry are interrelated and depend upon the particular circumstances of each case." Simmons, 54 S.W.3d at 762 (declining to articulate a bright-line rule for speedy trial claims); see also Barker, 407 U.S. at 530 ("A balancing test necessarily compels courts to approach speedy trial cases on an ad hoc basis."). If a reviewing court concludes that the accused has been denied the right to a speedy trial, the only remedy is reversal of the conviction and dismissal of the indictment. See Barker, 407 U.S. at 522; Bishop, 493 S.W.2d at 83. We review a trial court's determination of whether

a defendant's right to a speedy trial was violated under an abuse of discretion standard. State v. Hudgins, 188 S.W.3d 663, 667 (Tenn. Crim. App. 2005) (citing State v. Jefferson, 938 S.W.2d 1, 14 (Tenn. Crim. App. 1996)); State v. Easterly, 77 S.W.3d 226, 236 (Tenn. Crim. App. 2001); State v. Gai D. Kuot, No. M2012-01884-CCA-R3-CD, 2013 WL 4539020, at *10 (Tenn. Crim. App. Aug. 26, 2013), perm. app. denied (Tenn. Dec. 11, 2013).

**A. Length of Delay.** First, we consider the length of the delay. A post-accusation delay of one year or more is "presumptively prejudicial" and will trigger a speedy trial inquiry. Utley, 956 S.W.2d at 494. "The reasonableness of the length of the delay depends on the complexity of the case." State v. Wood, 924 S.W.2d 342, 346 (Tenn. 1996). "[D]elay that can be tolerated for 'an ordinary street crime' is generally much less than for a serious, complex felony charge." Easterly, 77 S.W.3d at 235 (quoting Barker, 407 U.S. at 530-31). However, the presumption that the delay has prejudiced the defendant intensifies over time. Simmons, 54 S.W.3d at 759 (citing Doggett, 505 U.S. at 652; Utley, 956 S.W.2d at 494; Wood, 924 S.W.2d at 346).

Here, the Defendant was arrested in late March 2009 and indicted on November 12, 2009. After three continuances, two of which the Defendant acquiesced in, the matter proceeded to trial on October 22, 2012. The post-accusation delay of three years and seven months was sufficient to warrant a speedy trial inquiry. However, the delay was not necessarily unreasonable when compared to other cases. See Simmons, 54 S.W.3d at 759 (approximate twenty-three-month delay between the return of the indictment and the defendant's arrest was not unreasonable); Wood, 924 S.W.2d at 346 (delay of thirteen years did not violate right to speedy trial); Bishop, 493 S.W.2d at 84-85 (delay of two years supported defendant's speedy trial claim but "[wa]s not per se extreme"); Barker, 407 U.S. at 533-36 (five-year delay between arrest and trial did not violate right to speedy trial). Moreover, the pretrial delay in this case was not unreasonable given the complexity and seriousness of the matter. The record reflects that the trial lasted ten days and involved over sixty witnesses. There were also multiple pretrial motions and hearings, including a two-day hearing regarding prior bad acts evidence. In our view, the length of delay weighs against the State, but not heavily.

**B. Reason for Delay.** The next factor to consider is the reason for the delay. The reasons for post-accusation delay generally fall within four categories: (1) intentional delay to gain a tactical advantage over the defense or to harass the defendant; (2) bureaucratic indifference or negligence, including lack of due diligence; (3) delay necessary for the fair and effective prosecution of the case; and (4) delay caused, or acquiesced in, by the defense. Wood, 924 S.W.2d at 346-47; see also Simmons, 54 S.W.3d at 759. Deliberate delay is weighed heavily against the State. Negligent delay is also weighed against the State, but less heavily than intentional delay. Delay necessary for effective prosecution, such as locating

a missing witness, is considered valid and not weighed against either party. A delay caused or agreed to by the defendant is weighed against the defendant. Wood, 924 S.W.2d 342, 346-47 (Tenn. 1996); see also Barker, 407 U.S. at 531.

In this case, the Defendant stipulated in his motion to dismiss for lack of speedy trial that he agreed to the continuances in March 2011 and August 2011. The record reflects that the State requested a continuance in January 2012 because it required more time to obtain fraud information related to the Defendant's federal indictments. Therefore, the ten-month delay from January 23, 2012 to the start of trial on October 22, 2012 resulted from a lack of due diligence on the part of the State. Although the defense argued at the motion hearing that the State delayed the trial for a tactical advantage, there is no evidence in the record of deliberate delay on the part of the State. This factor weighs against the State because it is the duty of the State, and not the accused, to bring the matter to trial. See Simmons, 54 S.W.3d at 759-60 (quoting Barker, 407 U.S. at 527). However, the State's lack of due diligence is counter-balanced by the Defendant's acquiescence in the pretrial delay.

**C. Assertion of Right.** The third factor to evaluate is whether the accused asserted the right to a speedy trial. Assertion of the right weighs strongly in favor of the defendant, while failure to assert the right will make it difficult to prove that the right has been denied. Simmons, 54 S.W.3d at 760 (citing Barker, 407 U.S. at 531-32). Here, the Defendant was incarcerated without bond since his arrest in March 2009. He formally asserted his right to a speedy trial by filing a motion to dismiss on January 17, 2012, nearly three years after his arrest. After the Defendant asserted his right, the trial began ten months later in October 2012. In our view, the assertion weighs in the Defendant's favor, but not heavily. See, e.g., Gai D. Kuot, No. M2012-01884-CCA-R3-CD, 2013 WL 4539020, at *12 ("[T]his factor weighs in the defendant's favor. However, the delay prior to the defendant's filing this motion was necessary, rational, and, in some regards, attributable to the defendant. Moreover, once the trial court heard the defendant's motion, it ruled that the defendant's case would be heard at its next trial date and the case commenced as scheduled within five months of the hearing.").

**D. Prejudice from Delay.** The final factor, the prejudice to the accused caused by the delay, is the most important to consider in the speedy trial inquiry. Simmons, 54 S.W.3d at 760 (citing Barker, 407 U.S. at 532; Wood, 924 S.W.2d at 348; Bishop, 493 S.W.2d at 85). The prejudice factor is assessed in light of the interests that the right to speedy trial is designed to protect. Barker, 407 U.S. at 532 (identifying three interests of the accused: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired."); see also Simmons, 54 S.W.3d at 760 (citing Bishop, 493 S.W.2d at 85). The Tennessee Supreme Court has observed that "the most important issue concerning prejudice to the defendant is

the impairment of the ability to prepare a defense." Berry, 141 S.W.3d at 568 (citing State v. Baker, 614 S.W.2d 352, 356 (Tenn. 1981)); see also Barker, 407 U.S. at 532 ("Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system."). "Faded memories, erosion or loss of potentially exculpatory evidence, and loss of potentially favorable witnesses are all possible results of a lengthy delay." Wood, 924 S.W.2d at 346.

Courts have recognized the difficulty in establishing impairment to the defense and have held that "affirmative proof of particularized prejudice is not essential to every speedy trial claim." See Doggett, 505 U.S. at 654–55 (finding delay of eight-and-a-half years between indictment and arrest caused by government's negligence to be "excessive" and a violation of defendant's speedy trial rights though defendant could not demonstrate specific prejudice). Nevertheless, in the majority of cases, "courts will still look for a demonstration of actual prejudice." Easterly, 77 S.W.3d at 238; Wood, 924 S.W.2d at 348; State v. Roger David Browder, No. 02C01–9606–GS–00201, 1998 WL 47877 (Tenn. Crim. App., Feb. 9, 1998) ("[E]ven though affirmative proof of particularized prejudice is not essential to every speedy trial claim, . . . we find it difficult to evaluate the degree to which the delay prejudiced the defendant absent some specific information about the deprivations which he incurred."), perm. app. denied (Tenn. Oct. 19, 1998).

In his brief, the Defendant contends that he was prejudiced because he suffered oppressive pretrial incarceration. He has not claimed that the delay caused him anxiety and concern. As the trial court noted, the Defendant would remain in federal custody without bond due to his pending fraud case, which minimized his claim of prejudice. See Baker, 614 S.W.2d at 356 ("It is apparent that the defendant was already incarcerated during the delay period. In such a case, the first two subfactors are nullified; no undue incarceration or anxiety resulting from public accusation can occur where the defendant is already in prison."); see also Bishop, 493 S.W.2d at 85 ("[A]nxiety accompanying public accusation, if any, was at a minimum since defendant was already serving time under a valid conviction[.]"); Berry, 141 S.W.3d at 569 ("[A]ny allegation as to the anxiety and stress suffered from his incarceration during this delay is minimized by evidence that he was also incarcerated awaiting trial for two other crimes unrelated to the crimes involved here.").

Additionally, the Defendant asserts without further elaboration that "[t]here is also a statement in the record that the appellant here was prejudiced by the loss of the memory of some of his witnesses[.]" Apart from this blanket assertion, there is no indication in the record that his defense was impaired at trial. See, e.g., Berry, 141 S.W.3d at 569 ("The bare allegation that the delay affected [the defendant's] ability to prepare a defense is unsupported by any specific examples."). Indeed, the record reflects that the defense presented multiple witnesses to counter the State's theory of the case and vigorously cross-examined the State's

witnesses, at times using transcripts from pretrial hearings to impeach witnesses and refresh recollections. The defense presented witnesses to support its theory that the police investigation was incompetent and that Brannick Drive residents witnessed the victim's vehicle and a woman who resembled the victim late Saturday afternoon. The fact that the jury reconciled all conflicts in favor of the State's theory does not mean that the defense was impaired. Moreover, the trial court stated at the motion hearing that the parties could request depositions if they were concerned about the loss of witnesses or fading memories. Based on the record, we cannot conclude that the delay affected the Defendant's ability to prepare a defense.

After applying the Barker balancing test, we conclude that the Defendant's right to a speedy trial was not violated. As we have previously noted, the factors are interrelated and depend on the particular circumstances of the case. While the lack of due diligence on the part of the State was certainly not appropriate, the Defendant agreed to the initial continuances which resulted in the post-accusation delay of twenty-one months. The total delay of three years and seven months was not unreasonable given the complexity of the case and the Class A felony charge. Moreover, the Defendant faced a multiple-count indictment in federal court, and he did not allege specific instances of prejudice to his defense. Accordingly, the Defendant has failed to established a speedy trial violation and the trial court did not abuse its discretion in denying the Defendant's motion to dismiss.

**II. Sufficiency of the Evidence.** The Defendant next argues that the evidence was insufficient to sustain his conviction for first degree premeditated murder. Specifically, he contends that the circumstantial evidence did not establish his guilt beyond a reasonable doubt. The Defendant further asserts that the only direct evidence connecting him to the homicide was the testimony of John Bowers, a federal prisoner seeking a sentence reduction. He claims that the physical evidence did not link him to the crime scene because the Avalanche was his everyday vehicle. Finally, the Defendant maintains that "there is no connection" between the homicide and his presence in a motel in Jackson five months later. In response, the State argues that there is sufficient evidence to support the jury's verdict. We agree with the State.

It is well established law that the State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court

or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).

The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (Tenn. 1963)).

"In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456-58 (Tenn. 1958)). However, "[t]he jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable, 313 S.W.2d at 457). This court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence. State v. Sisk, 343 S.W.3d 60, 65 (Tenn. 2011) (citing State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010)). We note that the standard of review "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Hanson, 279 S.W.3d 265, 275 (quoting State v. Sutton, 166 S.W.3d 686,

689 (Tenn. 2005)); State v. Carruthers, 35 S.W.3d 516, 557 (Tenn. 2000). The court in Dorantes specifically adopted the standard for circumstantial evidence established by the United States Supreme Court in Holland:

> "Circumstantial evidence . . . is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more."

Dorantes, 331 S.W.3d at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)).

"The identity of the perpetrator is an essential element of any crime." State v. Robert Wayne Pryor, No. M2003-02981-CCA-R3-CD, 2005 WL 901140, at *3 (Tenn. Crim. App. Apr. 19, 2005) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving "the identity of the defendant as the perpetrator beyond a reasonable doubt." Id. (citing State v. Sneed, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995)). The State may prove the perpetrator's identity using only circumstantial evidence. Rice, 184 S.W.3d at 662 (citing State v. Reid, 91 S.W.3d 247, 277 (Tenn. 2002)). The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993) (citing State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)).

The Defendant was convicted of first degree murder, which is defined as "[a] premeditated and intentional killing of another[.]" T.C.A. § 39-13-202(a)(1) (2006). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Id. § 39-11-302(a). Premeditation is defined as "an act done after the exercise of reflection and judgment." Id. § 39-13-202(d). This section further defines premeditation:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. "'Premeditation' is the process of thinking about a proposed killing before engaging in the homicidal conduct." State v. Brown, 836 S.W.2d 530, 540-41 (Tenn. 1992) (quoting C. Torcia, Wharton's Criminal Law § 140 (14th ed. 1979)).

The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Rosa, 996 S.W.2d 833, 837 (Tenn. Crim. App. 1999) (citing Brown, 836 S.W.2d at 539). These factors include, but are not limited to, "the use of a deadly weapon upon an unarmed victim; the particular cruelty of a killing; the defendant's threats or declarations of intent to kill; the defendant's procurement of a weapon; any preparations to conceal the crime undertaken before the crime is committed; destruction or secretion of evidence of the killing; and a defendant's calmness immediately after a killing." State v. Davidson, 121 S.W.3d 600, 615 (Tenn. 2003) (citing Bland, 958 S.W.2d at 660; State v. Pike, 978 S.W.2d 904, 914-15 (Tenn. 1998)). This court has also noted that the jury may infer premeditation from any planning activity by the defendant before the killing, evidence concerning the defendant's motive, and the nature of the killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995) (citation omitted). In addition, a jury may infer premeditation from a lack of provocation by the victim and the defendant's failure to render aid to the victim. State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

We conclude that the evidence, though largely circumstantial, was sufficient to sustain the Defendant's conviction for the first degree murder of his wife. Although the Defendant argues on appeal that the circumstantial and physical evidence does not establish his identity as the perpetrator and that the testimony of John Bowers was unreliable, it was the jury's prerogative to evaluate the credibility of witnesses, to determine the weight given to the testimony, and to resolve all conflicts in the evidence. See Odom, 928 S.W.2d at 23. "[O]ur duty on appeal of a conviction is not to contemplate all plausible inferences in the Defendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." Sisk, 343 S.W.3d at 67. Here, the State meticulously built an overwhelming circumstantial case against the Defendant. The jury was well aware that Mr. Bowers was a federal inmate who could seek a sentence reduction after cooperating with the authorities. Moreover, the jury was instructed to judge the truth and weight of the confession evidence and to disregard portions that it considered to be untrue. The jury also assessed the circumstantial and physical evidence and reconciled all conflicts in favor of the State's theory. See Bland, 958 S.W.2d at 659; see also Carruthers, 35 S.W.3d 516, 557-58.

Based on the evidence presented at trial, a rational trier of fact could have found the essential elements of first degree murder beyond a reasonable doubt. After considering all the proof, the jury could find that the Defendant was the perpetrator in his wife's murder and that he engaged in the homicidal conduct with intent and premeditation. The jury could

reasonably infer from the evidence that at some point between 10:30 to 11:30 a.m. on Saturday, October 25, 2008, the Defendant either suffocated or strangled the victim and then moved the Avalanche into the garage to load her body in the back. Because of the bruises on the victim's body and on the Defendant's forearms, the jury could reasonably infer that there was a struggle and that the Defendant held the victim down as he obstructed her supply of oxygen. After the victim became unconscious, the Defendant would have had to maintain the suffocation or strangulation for a few more minutes to cause death. Therefore, the jury could infer that the Defendant had time to reflect on his actions and to form the conscious objective or desire to murder the victim.

The jury could also infer premeditation based on the circumstances surrounding the offense. The Defendant called Gary Hathaway in an attempt to establish an alibi and drove from his home to Bartlett, using a cell tower in the area while in transit. The Defendant then dropped off the Avalanche at Brannick Drive at around 12:30 p.m., walked to his storage unit two blocks away to retrieve his Chevelle, and then arrived at the Hathaway home at around 1:00 p.m. He remained at the Hathaways' garage for the next three hours and was relatively calm after the victim's homicide. The jury could also reasonably infer that the Defendant attempted to conceal evidence because he was reluctant to contact the police about his wife's disappearance, he told the Corvette Club members not to search in Bartlett, he repeatedly suggested that his wife may have "run off" with someone, and he never advised law enforcement about his neighbors' surveillance video. Moreover, the jury was instructed that it could consider flight as an inference of guilt when evaluating the totality of the evidence. See, e.g., Hackney v. State, 551 S.W.2d 335, 339 (Tenn. Crim. App. 1977) (concluding that "[the defendant's] flight from the scene, his inconsistent statements following the event, and his apparent unconcern and lack of surprise or shock at the desperate plight of his lover all indicate a consciousness of guilt from which the jury could infer unlawful conduct on his part toward the deceased"); Marable, 313 S.W.2d at 459 (concluding that guilt may be inferred from the actions of the accused indicating a desire to evade prosecution); Tillery v. State, 565 S.W.2d 509, 511 (Tenn. Crim. App. 1978) (concluding that guilt may be inferred from the attempts of the accused to conceal or destroy evidence). Here, the evidence in the record was more than sufficient to support the jury's verdict. The Defendant is not entitled to relief on this issue.

**III, IV & V. Prior Bad Act Evidence.** On appeal, the Defendant contends that the trial court erred in allowing character evidence in violation of Tennessee Rule of Evidence 404(b). Specifically, the Defendant argues that the trial court erred in admitting proof of his financial fraud, of his conflict with the victim's mother, and of his extramarital affair with Becky Black. The State responds that the trial court properly admitted the evidence to establish the Defendant's motive and intent to kill the victim. The State further asserts that, in any event, any error was harmless and did not affect the verdict. We will examine each

of the Defendant's Rule 404(b) arguments in turn.

Tennessee Rule of Evidence 404(b) provides:

> **Other Crimes, Wrongs, or Acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). We note that "Rule 404 was patterned in great measure on State v. Parton, 694 S.W.2d 299 (Tenn. 1985), wherein our supreme court ruled that evidence of other crimes is generally inadmissible." State v. McCary, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). Rule 404 "establish[es] that character evidence cannot be used to prove that a person has a propensity to commit a crime." Id. (citing Tenn. R. Evid. 404(b); State v. Adkisson, 899 S.W.2d 626, 645 (Tenn. Crim. App. 1994)). The Tennessee Supreme Court has cautioned that trial courts should take a "restrictive approach" to 404(b) evidence because such proof "'carries a significant potential for unfairly influencing a jury.'" State v. Jackson, ___ S.W.3d ___, No. W2009-01709-SC-R11-CD, 2014 WL 4161966, at *39 (Tenn. Aug. 22, 2014) (quoting State v. Dotson, 254 S.W.3d 378, 387 (Tenn. 2008)). "'[T]he risk that a jury will convict for crimes other than those charged—or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment—creates a prejudicial effect that outweighs ordinary relevance.'" Id. (quoting State v. Sexton, 368 S.W.3d 371, 403 (Tenn. 2012)). The more similar the conduct or act to the crime for which the defendant is on trial, the greater the potential for a prejudicial result. McCary, 119 S.W.3d at 243 (citing Bordis, 905 S.W.2d at 232). The term "other purposes" in Rule 404(b) has been defined to include motive, intent, guilty knowledge, identity of the defendant, absence of mistake or accident, a common scheme or plan, completion of the story, opportunity, and preparation. State v. Berry, 141 S.W.3d 549, 582 (Tenn. 2004) (citing State v. Robert Wayne Herron, No. M2002-00951-CCA-R3-CD, 2003 WL 151201, at *2 (Tenn. Crim. App. Jan. 22, 2003)).

We review a trial court's Rule 404(b) ruling under an abuse of discretion standard, provided that the trial court has substantially complied with the prerequisites of the rule. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). However, if a trial court fails to substantially comply with the requirements of the rule, then the trial court's decision is not entitled to deference by the reviewing court. Id. In this case, the trial court complied with the prerequisites of the rule; thus, we will reverse only upon finding an abuse of discretion.

**A. <u>Proof of the Defendant's Financial Fraud.</u>** First, the Defendant argues that the trial court erred in allowing several witnesses to testify regarding his alleged financial misconduct. He claims that the admission of this proof was speculative regarding motive because "there is no evidence that the victim had any knowledge of the frauds" and because the prior acts were not perpetrated against the victim. The State responds that the trial court properly admitted the evidence and that Rule 404(b) and case law does not limit the admissibility of such proof to bad acts committed against the victim. In his reply brief, the Defendant asserts that the proof of financial fraud was improperly admitted as motive evidence because there was "no relevant connection between the proof of other crimes and the homicide." Upon review, we conclude that the trial court erred in admitting this evidence.

Prior to trial, the State filed a Rule 404(b) motion seeking to introduce evidence of the Defendant's fraudulent business practices to prove his motive, intent, and to show the context of the relationship between the Defendant and the victim. The State offered the evidence to support its theory that "the Defendant killed the victim because he was losing control of the victim, the victim's relationships with others, and the couple's finances." Specifically, the State sought to show that the victim was excited about the purchase of a new home, but that the Defendant repeatedly postponed the closing date to avoid scrutiny of his finances. The State asserted that the Defendant decided to kill the victim because he was "running out of time" to prevent her from discovering his fraudulent scheme, which had spanned seven years and involved their friends. The Defendant responded that the State failed to offer clear and convincing evidence of financial fraud and that the proffered testimony involved the Defendant's "conduct in matters totally unrelated to the death of his wife."

At the two-day pretrial hearing on the Rule 404(b) motion, the trial court heard the testimony of postal inspector Thomas Terry regarding his investigation of the Defendant's fraudulent scheme. The court also heard the proffered testimony of fraud victims Matt and

Cathy Struna, Michael Roper, John Marr,[7] Bruce Black, and Carrie Brown. The trial court subsequently entered a detailed written order regarding its Rule 404(b) ruling. In determining that the proof of financial fraud was admissible, the trial court held that this evidence was relevant for the purpose of establishing motive and intent.

The trial court reasoned that it was logical to infer "that the possibility of facing criminal penalties provides a motive to keep the frauds from coming to light." Because the frauds were perpetrated against the Caronnas' friends, the trial court stated that it was also logical to infer "that discovery of any fraudulent activity by the victim would lead to the revelation of all of his financial schemes." The trial court found clear and convincing evidence that the Defendant controlled the couple's finances and that he "was engaged in a fraudulent financial scheme in the years immediately preceding the death of his wife." With the exception of the Hathaways, the court found clear and convincing evidence of the fraudulent transactions offered by the State. The trial court concluded that the evidence of the financial crimes had "substantial probative value in establishing circumstances in which the defendant would have a motive to conceal and or continue his multiple frauds." The court also noted the probative value of the frauds in identifying the Defendant as the perpetrator in the victim's homicide. The trial court held that the danger of unfair prejudice did not outweigh the probative value of the financial fraud evidence because economic crimes were dissimilar from the charged offense of murder. Although a 57-count indictment was returned against the Defendant in federal court, the trial court noted that the State had only offered proof of six frauds, which lessened the possibility that the evidence would be used for propensity purposes. The trial court further stated that it would instruct the jury regarding the appropriate use of proof of other crimes.

Regarding the Defendant's fraudulent business practices, Matt Struna testified at trial that he wrote a $15,000 check to Caronna Investments for an Allianz annuity, which was never forwarded to the company. Carrie Brown testified that she invested $20,794.82 with the Defendant for an Allianz annuity, but she discovered that this account did not exist after the Defendant wired her $10,000 from his own bank account. Donna Marr testified that she wrote the Defendant three checks that were never invested in Allianz. Michael Roper identified nine checks written to Caronna Investments for annuity products that were never sent to Allianz or Jefferson Pilot. Bruce Black testified that he was missing two annuity products after having written two checks to Caronna Investments and that the Defendant failed to produce Allianz documents despite repeated requests. Thomas Terry, Lisa Jones, and Lori Wells all testified regarding their investigation of the Defendant's financial fraud and the altered documents that the Defendant provided to his clients. Inspector Terry

---

[7] We note that the State offered proof that the Defendant perpetrated fraud against both John and Donna Marr. Donna Marr did not testify at the pretrial hearing, and John Marr did not testify at trial.

specifically identified various checks from the aforementioned victims that were deposited into the Defendant's personal account and never forwarded to the insurance companies.

At the close of all proof, the trial court gave the standard Rule 404(b) limiting instruction to the jury. (See also 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 42.10.).

On appeal, the Defendant contends that the trial court erred in admitting the proof of financial fraud in violation of Rule 404(b) because there was no evidence that the victim was aware of these acts. In his brief, the Defendant cites a line of cases for the proposition that prior bad acts evidence is inadmissible to establish motive unless the acts were committed against the victim. See Bordis, 905 S.W.2d 214 (reversing defendant's conviction for first degree murder of his infant son because the trial court admitted unfairly prejudicial evidence of the defendant's sexual proclivities); State v. Glebock, 616 S.W.2d 897, 905-06 (Tenn. Crim. App. 1981) (concluding in attempted first degree murder case that evidence that the defendant had previously broken into ex-wife's apartment and sent her a threatening postcard was relevant and probative of a settled purpose to harm her); State v. Turnbill, 640 S.W.2d 40 (Tenn. Crim. App. 1982) (holding that evidence that the defendant was previously arrested for robbery of the victim was properly admitted in prosecution for the victim's first degree murder because proof of prior relations between the victim and the defendant was relevant to the issue of intent); State v. Smith, 868 S.W.2d 561 (Tenn. 1993) (concluding that evidence of the defendant's prior threats and assaults against the victims was admissible to establish the defendant's motive for the victims' murders).

As a general rule, evidence tending to show motive to commit a crime, even though prejudicial, is relevant and admissible. Goedel v. State, 567 S.W.2d 180, 182 (Tenn. Crim. App. 1978) (citing Ivey v. State, 210 Tenn. 422, 360 S.W.2d 1, 3 (1962)). Such evidence is particularly important in cases built wholly or partially on circumstantial evidence. However, even if the evidence is offered to establish the defendant's motive, it must be relevant to be admissible. In order to determine whether the introduced "crimes or bad acts" of the Defendant were relevant to establish motive, we must determine whether the evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. Rule Evid. 401.

Here, the State admitted six separate acts of financial fraud committed by the Defendant against third party victims as the reason why the Defendant killed his wife. The State explained that the Defendant was "running out of time" before the victim would discover that they were in financial ruin. The State theorized that the victim would inevitably discover the Defendant's financial crimes after they were unable to close on their new house as the victim had expected. The State inferred from this that the victim would (1) discover

-45-

that the Defendant had been stealing from their friends and (2) reveal and report the Defendant's financial misdeeds to police. For these reasons, the State theorized the Defendant killed the victim to prevent her from disclosing his crimes to the police.

Based on the proof in this case, we agree with the Defendant, and conclude that the admission of the Defendant's financial crimes as prior bad acts was error. The trial court admitted the financial crimes evidence reasoning that the Defendant killed the victim in order to conceal, continue, or cover-up another crime; namely, his financial fraud. However, we find the purported relevance of the Defendant's financial crimes to the instant case extremely speculative. State v. Raymond Bailey, No. W2004-00512-CCA-R3-CD, 2005 WL 1215965, at * 6 (Tenn. Crim. App. May 2005) (holding that it was error to admit prior bad act drug testimony because evidence that cocaine/drug funds was motive for the carjacking was "speculative at best"). There was no direct or indirect proof that the Defendant killed the victim to continue or to conceal the financial crimes. There was also no proof establishing (1) that the victim was aware of the financial crimes committed against the third parties; (2) that the victim's death would have prevented the Defendant's fraud from being disclosed; or (3) any reasonable connection between the crimes at issue. Without any additional proof, the fact that the Defendant stole thousands of dollars from third parties does not make it more probable than not that he killed the victim. See State v. Charles Edwin Lamb, No. 03C01-9701-CR-00010, 1998 WL 103316, at * 10 (Tenn. Crim. App. Feb. 1998). In concluding that there was error in admitting the evidence of financial fraud in this case, we do not hold that motive evidence under Rule 404(b) is limited to bad acts perpetrated against the victim of the instant offense or where the victim had knowledge of the other crimes. See State v. Moss, 13 S.W.3d 374, 384 (Tenn. Crim. App. 1999) (allowing evidence of bad acts committed against a third party in order to prove motive to kill the victim where there is a link between the crimes committed against the third party and the victim). Rather, we hold that there was no evidence from which the jury could reasonably infer that the Defendant killed the victim to prevent her from discovering or disclosing his financial misdeeds.

Nevertheless, in light of the overwhelming evidence of the Defendant's guilt in this case, we further conclude that the trial court's error in admitting the financial crimes evidence was harmless. When undertaking a harmless error analysis, this court must consider whether "an error more probably than not had a substantial and injurious impact on the jury's decision-making." State v. Rodriguez, 254 S.W.3d 361, 372 (Tenn. 2008). "The line between harmless and prejudicial error is in direct proportion to the degree of the margin by which the proof exceeds the standard required to convict beyond a reasonable doubt." State v. Carter, 714 S.W.2d 241, 248 (Tenn. 1986). As noted above, the State meticulously built the case against the Defendant with over 40 witnesses. The time line established that the Defendant was the last person to see the victim alive and was inconsistent with the

Defendant's version of events leading up to the victim's disappearance. The Defendant also fabricated an alibi in anticipation of foul play. Finally, the Defendant confessed to killing the victim to another inmate-witness. Accordingly, any error in admitting the prior bad act evidence in this case was harmless.

**B. Proof of Bad Acts Relating to Clara Murphy.** Next, the Defendant contends that the trial court erred in admitting evidence concerning prior bad acts relating to the victim's mother, Clara Murphy. Before trial, the State sought to introduce evidence of an incident in the summer of 2007 in which the Defendant allegedly stole $12,000 from the victim's family. After a pretrial hearing, the trial court ruled that the evidence of the alleged theft was inadmissible, but allowed the State to present other contextual proof explaining the relationship between the Defendant, the victim, and the victim's family. Subsequently, Ms. Murphy testified at trial that she and the victim became estranged in June 2007 after the victim sided with the Defendant in a family disagreement. On appeal, the Defendant asserts that the testimony was admitted in error because "[i]t is purely character evidence that makes the [Defendant] look like a bad guy without knowing what he had done." The State responds that the proof of the strained relationship was relevant to explain why the Defendant did not call Ms. Murphy after the victim's disappearance. We conclude that the Defendant has waived this issue for failure to include it in his motion for new trial.

Although the Defendant argued in his motion for new trial that the trial court erred in granting the State's 404(b) motion regarding evidence of financial crimes and of the Defendant's adulterous affair, he did not allege that the trial court erred in admitting prior bad acts testimony involving Clara Murphy. Consequently, the Defendant has waived this issues for our consideration. See Tenn. R. App. P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."); State v. Hill, 333 S.W.3d 106, 128 (Tenn. Crim. App. 2010) (holding that the defendant waived his Rule 404(b) issue by failing to include it in his motion for new trial). Moreover, the Defendant did not request that this court consider the issue under our discretionary "plain error" review. See Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."); State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) ("It is the accused's burden to persuade an appellate court that the trial court committed plain error."); see also State v. Ricky E. Scoville, No. M2006-01684-CCA-R3-CD, 2007 WL 2600540, at *2 (Tenn. Crim. App. Sept. 11, 2007) ("[R]arely will plain error review extend to an evidentiary issue."). The Defendant is not entitled to relief on this issue that he omitted from his motion for new trial.

**C. Proof of the Defendant's Affair with Becky Black.** Finally, the Defendant argues that the trial court erred in allowing the jury to hear testimony regarding his adulterous affair because the evidence was highly prejudicial and not probative of motive. Specifically, the Defendant maintains that the victim was aware of the extramarital relationship with Becky Black and that "the parties had reconciled on the issue[.]" In response, the State contends that the trial court properly admitted the proof because the testimony was relevant to show the Defendant's motive and intent to kill the victim and to marry Ms. Black. We conclude that the trial court did not abuse its discretion in the admission of this proof.

Before trial, the State sought to introduce evidence of the Defendant's extramarital affair to establish motive and intent and to explain the context surrounding the victim's homicide. In the memorandum of law in support of its Rule 404(b) motion, the State alleged that the Defendant killed the victim "to ensure he could live his life with Becky Black." In response, the Defendant argued that the affair evidence was irrelevant to the issue of motive because the relationship "was nearly as old as the marriage and it was not a secret." The Defendant further asserted that testimony regarding the affair was impermissible character evidence and that any probative value of the proof was outweighed by its prejudicial effect.

At the pretrial hearing, the trial court heard the testimony of Cheryl Brady, Bruce Black, Patti Locke, and Becky Black regarding the Defendant's long-term affair with Ms. Black. Specifically, Ms. Black testified that she began an intimate relationship with the Defendant in 2000 and that the affair continued until around February 2009, after the victim's death.

In granting the State's Rule 404(b) motion to admit proof of the affair, the trial court held that this evidence was relevant to the issue of motive and intent in the victim's murder and also explained the relationship between the Defendant and the victim. Citing State v. Robinson, 73 S.W.3d 136 (Tenn. Crim. App. 2001), State v. Brock, 327 S.W.3d 645 (Tenn. Crim. App. 2009), and State v. Johnson, 743 S.W.2d 154 (Tenn. 1987), the trial court stated that "[t]he case law is abundant that evidence of an extramarital affair is relevant to the non-propensity purposes submitted by the State." The trial court found proof of the affair with Becky Black to be clear and convincing. The court noted that evidence of an affair "does not show a propensity for murder[,]" and concluded that the probative value was not outweighed by the danger of unfair prejudice.

Tennessee case law has consistently held that proof of a defendant's extramarital conduct is admissible for non-propensity purposes in the prosecution of spousal homicide. See Johnson, 743 S.W.2d 154 (in first degree murder trial for the suffocation death of defendant's wife, evidence of defendant's extramarital affair was admissible to establish motive and to show the couple's relationship); Robinson, 73 S.W.3d 136 (concluding that

the probative value of evidence of defendant's extramarital affairs to show motive for wife's murder was not substantially outweighed by danger of unfair prejudice in first degree murder trial); Brock, 327 S.W.3d 645 (affirming defendant's conviction for the first degree murder of his wife and finding that evidence of extramarital affair reflected a possible motive for murder); State v. March, 395 S.W.3d 738 (Tenn. Crim. App. 2011) (concluding that trial court did not abuse its discretion in admitting evidence of defendant's prior infatuation with his co-worker because this proof was relevant to show a motive for the murder of his wife); State v. Deon Lamont Cartmell, No. M2012-01925-CCA-R3-CD, 2014 WL 3056164 (Tenn. Crim. App. July 7, 2014) (concluding that evidence that defendant was texting other women before and after his wife's death was relevant to the couple's relationship and was admissible to show motive in the shooting death of the victim). Moreover, the trial court gave a limiting instruction that this proof could only be considered for the purposes of establishing identity, motive, intent, and the couple's relationship, and the jury is presumed to follow the instructions of the court. See State v. Parker, 350 S.W.3d 883, 897 (Tenn. 2011) (citing State v. Kiser, 284 S.W.3d 227, 272 (Tenn. 2009); State v. Shaw, 37 S.W.3d 900, 904 (Tenn. 2001)). Accordingly, the trial court did not abuse its discretion in admitting the evidence of the extramarital affair, and the Defendant is not entitled to relief.

**V. Admission of the Victim's Statements.** The Defendant contends that the trial court erred in allowing several witnesses to testify about the victim's statements regarding her excitement about the closing on a new house. He asserts that the testimony was inadmissible hearsay and irrelevant to the issue of motive. Specifically, the Defendant maintains that the victim's statements were introduced to establish her belief of an alleged closing date and did not constitute exceptions to show the victim's state of mind. The State responds that the trial court properly admitted the testimony to establish the victim's state of mind that she expected to close on her new house on the Monday after her death. The State further argues that this evidence supported its theory that the Defendant killed the victim to eliminate the risk of exposure of his financial frauds. We conclude that the trial court did not abuse its discretion in admitting this proof.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Rule 802 states that "hearsay is not admissible except as provided by these rules or otherwise by law." Tenn. R. Evid. 802. "'The determination of whether a statement is hearsay and whether it is admissible through an exception to the hearsay rule is left to the sound discretion of the trial court.'" State v. Thomas, 158 S.W.3d 361, 400 (Tenn. 2005) (quoting State v. Stout, 46 S.W.3d 689, 697 (Tenn. 2001)). This court will not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record. State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010) (citing State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007)).

Tennessee courts have long recognized the state of mind hearsay exception. Tenn. R. Evid. 803(3), Advisory Comm'n Cmts. Under Rule 803(3), the hearsay rule does not exclude a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health) . . ." Tenn. R. Evid. 803(3). "Combining the hearsay exception with relevancy principles, declarations of mental state will be admissible to prove mental state at issue or subsequent conduct consistent with that mental state." Id., Advisory Comm'n Cmts.

Even if a statement qualifies as a hearsay exception or is non-hearsay, it must be relevant to be admissible. Tenn. R. Evid. 402. Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, evidence that is relevant "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. The Tennessee Supreme Court has defined unfair prejudice as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one.'" State v. Mitchell, 343 S.W.3d 381, 389 (Tenn. 2011) (quoting State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978)). "Rule 403 decisions fall within the discretionary authority of the trial court and will not be overturned absent an abuse of discretion." Id.

Here, the State's theory of the case was that the Defendant continuously postponed the closing on a new house to avoid scrutiny of his finances and that he killed the victim before the alleged closing on Monday, October 27, 2008, to prevent the exposure of his fraud. To that end, the State sought to introduce testimony from various witnesses regarding the victim's statements about the upcoming closing on the new house. Before each of the witnesses testified about the victim's statements, the trial court heard the proffered testimony in a jury-out hearing or during a bench conference. After the witnesses testified regarding the victim's statements, the trial court repeatedly admonished the jury that the statements were not offered for the truth of the matter and that they related to the victim's state of mind.

At trial, Pat Hathaway testified that the victim said on the phone on Saturday morning that the Defendant "was going to surprise [her] with a closing of the house" the night before. Patti Locke testified that the victim told her on the phone on Friday about the changes she planned on making in the new house. However, Ms. Locke was not aware of a particular closing date. Carrie Brown testified that she spoke with the victim on the phone on Thursday and that the victim was excited about the new house.

In a bench conference during the testimony of the victim's co-worker, Brad Whitener,

the State argued that the victim's statements of the alleged closing date on Monday, October 27 were not offered for the truth of the matter but to establish the victim's state of mind and feelings. The defense argued that the statements were hearsay and did not qualify under the state of mind exception. The trial court noted the objection of the defense and held:

> I'm going to allow them to go into those areas, but I'll instruct the jury it's not for the truth of the matter asserted but just what -- I think it also goes -- it relates to her state of mind. It's factual but it relates to her state of mind, but more importantly, it's not offered for the truth.

Mr. Whitener then testified that the victim died before the closing that was scheduled for Monday, October 27, and the court instructed the jury that the victim's statement was not offered for the truth that the closing was on October 27 but to explain what was going on in the victim's mind.

During a jury-out hearing prior to the testimony of witnesses Brenda Berlin and Cheryl Brady, the court explained its analysis and handling of this issue:

> Well, if it's not -- we've got two different things going here and sometimes these are overlapping but I think we should be clear for the record.
>
> . . .
>
> We have an exception to the hearsay rule for state of mind. We also have the fact that it's not hearsay if it's not offered for the truth of the matter asserted and some of these are overlapping each other and some apply -- both of those principals [sic] apply to some of these. One of these principles applies to some of these. And we've got -- so we've got three possible combinations. Either both of them apply or it's non-hearsay or it's covered under the state of mind.
>
> And I'm having to evaluate all these statements under all three of these possibilities here.
>
> The State's saying this is not hearsay because they're offering this not for the truth of the matter asserted on this particular point.
>
> Of course, whenever they do that I need to tell the jury they've offered it not for the truth of the matter asserted.

I don't need to do that if it's an exception under the state of mind. That comes in through the truth of the matter asserted, and so we've got all this stuff working and it's -- at the same time.

The trial court ruled that statements of the victim's excitement about the new house were admissible under the state of mind exception, and the defense expressly agreed on that issue. The victim's co-worker Brenda Berlin subsequently testified regarding the postponements of the closing on the house throughout October 2008, with a closing ultimately scheduled for the end of the month. The trial court instructed the jury that statements regarding the closing were not submitted for their truth, but were only to be considered for their effect on the victim's thinking. The defense did not object to this testimony.

We conclude that this evidence was non-hearsay. The victim's statements regarding the upcoming closing were not offered to prove the fact that the closing was scheduled for Monday, October 27. Indeed, the State presented testimony that a closing could not have occurred that day. Stephanie Dodson of Edco Title testified that she was unable to obtain lender information from the Defendant and that there was never a closing scheduled for Friday, October 24. Real estate agent Mary Ann Tapp testified that she could not obtain mortgage and insurance information from the Defendant, and the closing did not take place. Janet Vanelli of Kellon Insurance testified that the Defendant met with her on Friday afternoon to purchase homeowner's insurance for a closing scheduled for Monday, October 27, but he never provided her with mortgage information, which was necessary for a closing. Dana McBride, another Kellon Insurance employee, testified without objection from the defense that Ms. Vanelli and the Defendant were at the office discussing the closing scheduled for the following Monday. Patricia Turner, a witness for the defense, testified that she spoke with the victim on Friday afternoon and that the victim expected to receive an insurance check which would be used toward the closing scheduled for the following Monday. During a bench conference, the defense argued that the Ms. Turner's testimony was offered to show the victim's state of mind and not to prove the truth of the matter asserted. The trial court allowed the testimony and provided the same instruction as before. Therefore, it would have been apparent to the jury that a closing could not have taken place on Monday, October 27, 2008. Regarding the fact that the victim was excited and believed that the closing was scheduled for Monday, we agree with the trial court that the victim's statements qualify under the state of mind exception.

As previously mentioned, even though these statements qualify as hearsay exceptions or non-hearsay, they must still be relevant to be admissible. See Tenn. R. Evid. 402. As in our resolution of the admission of the financial crimes evidence, we agree with the Defendant, and conclude that the relevance of these statements was marginal, at best. However, any error in the admission of this evidence was harmless in light of the

overwhelming evidence of the Defendant's guilt at trial. Accordingly, the Defendant is not entitled to relief.

## **CONCLUSION**

Upon review, we affirm the judgment of the Shelby County Criminal Court.

_____
CAMILLE R. McMULLEN, JUDGE